[No. G039830. Fourth Dist., Div. Three. May 6, 2009.]

CARMINE SCOTCH, Plaintiff and Appellant, v.
THE ART INSTITUTE OF CALIFORNIA-ORANGE COUNTY, INC.,
Defendant and Respondent.

**COUNSEL**

Harrison, Tibor & Castillo and David F. Tibor for Plaintiff and Appellant.

Curiale Dellaverson Hirschfeld & Kraemer, Kirstin E. Muller; Curiale Hirschfeld Kraemer and Judy M. Iriye for Defendant and Respondent.

## OPINION

**FYBEL, J.—**

### INTRODUCTION

Carmine Scotch sued his former employer, The Art Institute of California—Orange County, Inc. (AIC), under the California Fair Employment and Housing Act, Government Code section 12900 et seq. (FEHA),[1] alleging discrimination based on disability. Scotch alleged AIC violated the FEHA by reducing his employment status to part time because he was HIV positive, failing to make a reasonable accommodation, failing to engage in the required interactive process, failing to maintain a workplace free of discrimination, and retaliating against him. Scotch also alleged AIC constructively discharged him in violation of public policy.

We apply the standard set forth in *Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088 [38 Cal.Rptr.3d 240] (*Kelly*) for reviewing a judgment following the grant of a defendant employer's motion for summary judgment in employment discrimination cases under the FEHA. We hold summary judgment was proper on Scotch's claim for disability discrimination in violation of section 12940, subdivision (a) because Scotch did not meet his burden of presenting evidence that (1) AIC's stated reason for the adverse employment decision was false or pretextual, and (2) there was a causal link between his revelation he was HIV positive and the adverse employment decision.

On Scotch's claim of failure to make a reasonable accommodation in violation of section 12940, subdivision (m), we follow *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 975–976 [83 Cal.Rptr.3d 190] (*Nadaf-Rahrov*) in defining reasonable accommodation to mean "a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired." AIC offered Scotch a reasonable accommodation. Scotch's proposed accommodation of priority in teaching assignments to ensure he maintained full-time employment status amounted to a guarantee of full-time employment, which AIC was not required to provide.

On Scotch's claim for failure to engage in the interactive process, we analyze cases on the issue whether the employee must identify a reasonable, available accommodation to recover under section 12940, subdivision (n). (Compare *Nadaf-Rahrov, supra,* 166 Cal.App.4th 952 with *Wysinger v.*

---

[1] All further code citations are to the Government Code unless otherwise noted.

*Automobile Club of Southern California* (2007) 157 Cal.App.4th 413 [69 Cal.Rptr.3d 1] (*Wysinger*) and *Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224 [35 Cal.Rptr.3d 837] (*Claudio*).) In light of the FEHA's remedial purpose, we reconcile these cases and hold to recover under section 12940, subdivision (n), the employee must identify a reasonable accommodation that was available at the time the interactive process should have occurred. We recognize that during the interactive process itself the employee does not have the same access to information about possible accommodations as the employer does. But, we also hold, through the litigation process, including discovery, the employee must be able to identify a reasonable accommodation that would have been available during the interactive process. Other than his proposed accommodation, which we conclude was not reasonable, Scotch did not identify such an accommodation and therefore cannot recover under section 12940, subdivision (n).

Finally, summary judgment was properly granted on Scotch's claims for retaliation, failing to maintain an environment free from discrimination, and termination of employment in violation of public policy.

FACTS

I.

*Background*

AIC is a design, media arts, and culinary arts school offering bachelor's and associate's degrees in, among other things, media arts and animation, game arts and design, and interior design. AIC is accredited by the Accrediting Council for Independent Colleges and Schools (ACICS) and is subject to its accreditation standards.

Full-time faculty at AIC teach at least five course sections or the equivalent per term, and part-time faculty teach four course sections or fewer per term. Full-time faculty receive benefits, such as health insurance and life insurance.

Scotch began his employment at AIC in 2003 as an instructor teaching four course sections, supplemented with time working in the student advising department. (The parties dispute whether Scotch was considered a full-time or part-time employee when he was hired.) Starting in 2004, Scotch taught five course sections per term in the game arts and design and media arts and animation departments.

Since early 2004, Scotch's immediate supervisor had been Lawrence Richman, the academic director for the game arts and design and media arts

and animation departments. Richman's immediate supervisor was Melinda Lester, the acting dean of academic affairs of AIC.

## II.

### Master's Degree Requirement

ACICS accreditation standards require all faculty members who teach upper division courses to hold a graduate degree, professional degree, or a bachelor's degree plus professional certification. AIC makes limited exceptions from the accreditation requirement to allow faculty members who do not have a graduate degree, but who have valuable work experience or other professional qualifications, to teach upper division courses.

Starting in 2004, AIC began preparing for ACICS's next onsite accreditation visit by identifying faculty members without advanced degrees. AIC's parent company, Education Management, offered to pay full tuition to faculty members who enrolled at Argosy University or to pay up to 80 percent of tuition at other qualifying schools. Sometime in 2004, an AIC assistant dean informed the faculty, including Scotch, that AIC was concerned about its accreditation, half of the faculty would have to obtain master's degrees, and the academic directors would contact those faculty members who would have to obtain a master's degree. Scotch was not contacted.

When Richman became an academic director at AIC in April or May 2004, he met with Scotch to introduce himself and to discuss areas of concern. During this meeting, Scotch asked not be scheduled to teach morning classes because he was taking medications making it difficult for him to drive in the morning. Scotch did not identify the medications or explain why he was taking them other than for "personal health issues."

In an e-mail dated November 7, 2005, Scotch informed Richman he was still looking into enrolling in a master's degree program. In this e-mail, Scotch stated: "Also, as you may recall, last year I made you aware of some personal health issues that limited my schedule. These health issues make it difficult for me to handle a full-time job, outside projects and multiple co[u]rse loads at the same time. It is imperative that I maintain a reasonable limit on my commitments in order to maintain my person[al] safeguards." Richman continued to provide Scotch with information about master's degree programs and offered to write letters of recommendation for him.

In December 2005, Scotch met with Richman and Sue Roig, an AIC administrator, to prepare a plan to obtain a master's degree. Scotch told them he had investigated the master's degree program at Argosy University, but did

not meet its grade point average requirement. Scotch nevertheless submitted a preapplication form to Argosy University in January 2006. In an e-mail to Scotch, dated January 19, 2006, Richman stated: "I'm glad to hear that you'll be pursuing your Master[']s degree at Argosy. In order to assure the funding is still in place for this, we'll need to expedite the process. I'm happy to write any letters necessary for your enrollment." In an e-mail dated January 23, 2006, Scotch informed Richman he had spoken with an admissions representative at Argosy University and needed to put together transcripts, his resume, and letters of recommendation. Scotch never enrolled in a master's degree program while employed at AIC.

### III.

*Scotch's Performance Review; March 15, 2006 Meetings*
*and Scotch's Disclosure of HIV-positive Status*

Scotch fell ill in February 2006, and, in an e-mail dated February 24, 2006, told Richman he had a sore throat and needed to cancel a school event. Two days later, Scotch informed Richman by e-mail he had strep throat, was highly contagious, and would not be able to teach for the rest of the week. Scotch did not inform Richman his illness resulted from his HIV-positive condition.

On March 15, 2006, Richman met with Scotch and gave him his 2006 performance planning and appraisal review (PPAR). Scotch received a score of 2.25 out of 5, a decline from his score of 2.5 for 2005, based in part on his lack of participation in faculty committees and professional development, and failure to enroll in a master's degree program. Richman nonetheless elected to give Scotch a 1.5 percent pay increase.

During the March 15 meeting, Scotch told Richman he was not happy with the PPAR score he had received, and informed Richman he had health issues and a "long-term illness" affecting his job performance and ability to pursue a master's degree. Once Scotch stated his health issues affected his job performance, Richman ended the meeting and took him to the office of AIC's director of human resources, Jane Marchman, to discuss the matter. Richman left to let Scotch and Marchman talk in private.

Scotch told Marchman he was displeased with his PPAR score, he had a "life-threatening illness," and he believed Richman used the performance review to "com[e] down on me for calling in sick." Scotch expressed concern over pursuing a master's degree, performing faculty development, continuing his consulting business, and teaching full time. Marchman asked Scotch what were his expectations of AIC. He replied he had a health issue. After

Marchman asked a few more questions, Scotch revealed he was HIV positive. He asked her to keep this information confidential. She replied, "it wouldn't leave the room."

Marchman offered to arrange a meeting between Scotch and Lester. When Scotch expressed concern that Richman and Lester were "buddies," Marchman replied, "[i]t's actually the opposite." She suggested formulating a plan to present to Lester. Scotch agreed.

After meeting with Scotch, Marchman walked to Lester's office, where she found both Lester and Richman. Marchman told them Scotch had a health condition. She did not disclose he was HIV positive.

## IV.

### Scotch's March 23, 2006 Meeting with Lester

Marchman arranged for Scotch to meet with Lester on March 23, 2006. Marchman suggested to Scotch that he focus the meeting on his plan for obtaining a master's degree and advised him the issue of his PPAR score likely would be discussed in a separate meeting. Scotch understood the purpose of this meeting was "to explain the way the PPAR review came out and discuss being careful about taking care of my health and the master's degree requirement and how that would impact, possibly, and if there's a way I could sort of slow down all the requirements so I could get all this done."

In the March 23 meeting, Scotch told Lester he had a "long-term illness," had been hospitalized, and "felt like there was some kind of weird retaliation going on." Scotch did not tell Lester, or anyone other than Marchman, he was HIV positive for fear of a "backlash." According to Lester, "Scotch mentioned his 'long-term illness' and [PPAR] score and told me he did not have time to fulfill his job duties and get a master's degree. Scotch said something to me to the effect that he could not be stressed out and had to have enough time to do his outside freelance work. My impression from the meeting was that Scotch was afraid that working on a master's degree would take away from his own freelance work." She did not interpret Scotch's comments about the PPAR score as a complaint of disability discrimination by Richman, but rather as being directed toward resolving concerns that study in a master's degree program would be time consuming.

Lester told Scotch the time spent working toward his master's degree would take the place of his professional development requirement and therefore would not increase his workload. She understood that Scotch had "health issues," suggested he enroll in a three-year rather than a two-year

master's degree program, and told him, "we would talk more again." At the time, Scotch was satisfied with Lester's response and thanked her. Although Scotch decided to reduce the amount of his freelance work to free up time to pursue a master's degree, he did not move beyond "evaluation" of his options.

V.

*Scheduling for Summer 2006 Term and Reduction in Scotch's Course Assignments*

In early 2006, AIC experienced a decline in enrollment. Education Management's vice-president of academic affairs conducted a site visit of AIC in spring 2006. After the visit, AIC cancelled many course sections for the summer term and reorganized its schedule. For the summer 2006 term, AIC terminated the employment of some faculty members and changed the status of others from full time to part time.

Lester stated in a declaration, "AI[C]'s first priority was to keep as many faculty members with master's degrees teaching on a full-time basis in order to avoid losing their commitments to AI[C] and to comply with ACICS accreditation requirements. Once the Academic Directors assigned as many of its upper-division courses as possible to faculty members with master's degrees, they were instructed to assign lower-division courses to faculty members with master's degrees who did not yet have a full-time schedule for the term. The Academic Directors also assigned any upper-division courses that did not have a faculty member with a master's degree qualified to teach the particular subject matter, to faculty members with experiential knowledge in the subject matter and who had enrolled in master's degree programs. Of the remaining faculty members (those without master's degrees and who were not currently enrolled in a program), the Academic Directors were instructed to assign courses to those who had been full-time before assigning courses to those who had been part-time." Between the spring and summer terms of 2006, AIC changed 10 faculty members from full-time to part-time status and asked seven faculty members to leave based on their failure to enroll in a master's degree program.

In the spring 2006 term, Scotch taught four lower division course sections in the media arts and animation department and one upper division course in the interior design department. In an e-mail dated April 20, 2006, Ronni Whitman, the AIC academic director for the interior design department, told Scotch, "[d]ue to the ACICS visit, I can't have you teaching upper division I[nterior] D[esign] classes in the future until you get a Master[']s degree."

Richman stated in his declaration: "The Academic Directors used a multi-tier process by which to assign the faculty members under my supervision, including Scotch, course sections for the summer 2006 term. This process was not significantly different from the way I had previously scheduled classes, except there was a greater emphasis on following ACICS's requirement that faculty members who taught upper-division courses have master's degrees. By the time I had finished filling the full-time schedules of faculty members with master's degrees or those actively enrolled in master's degree programs, per AI[C]'s multi-tier process, there were not enough lower-division course sections to assign Scotch five course sections."

## VI.

### *Scotch's May 5, 2006 Meeting with Richman and Lester*

On May 5, 2006, Richman and Lester met with Scotch to inform him he would be assigned only three course sections for the summer term instead of his previous four or five, thereby changing his status to part time. Richman told Scotch AIC had experienced lower enrollment, needed to have faculty members with master's degrees teach upper division courses, was condensing classes, and was changing Scotch to part-time status due to his PPAR score. Scotch asked whether "they still wanted me to pursue a master's degree," and was told, " '[y]es, you should still look into that even as part-time.' " Lester told Scotch the course assignment decisions were based on factors such as "experience, what kind of classes had been taught in the past, how long you had been at the school."

Richman offered to contact The Art Institute of California's Los Angeles campus to learn whether Scotch could teach a course there. Richman later informed the academic director for the media arts and animation department at the Los Angeles campus he had several faculty members who needed to teach extra courses to maintain full-time status. Richman was told no additional courses were available at the Los Angeles campus. Richman also contacted The Art Institute of California's Inland Empire campus, but never spoke to anyone there. Scotch declined Richman's offer to contact The Art Institute of California's San Diego campus because it was too far away. Richman was later able to assign Scotch a fourth lower division course at AIC for the summer 2006 term.

## VII.

*June 16, 2006 Meeting with Marchman; Scotch's June 11
Letter*

On June 16, 2006, Scotch met with Marchman to learn if there was any way he could keep his medical benefits and the life insurance he received as a full-time AIC employee. He asked Marchman whether AIC changed his status to part time because he was HIV positive. She replied, "absolutely not." Marchman testified she had not told anybody that Scotch was HIV positive, and, in her declaration, stated Scotch's change in employment status was due to ACICS accreditation requirements.

Marchman told Scotch the decision to reduce his course load was based on his performance review. She told him that, because he received a low PPAR score, he "should have seen this coming" and added, "normally someone with that score would have already been gone." When Scotch asked why AIC had not terminated his employment, Marchman replied she "was involved in this, that Melinda [Lester] and Larry [Richman] wanted to get rid of [him], but she was fighting for [him]."

Later in June, Scotch tried to meet with Marchman to place a letter in his personnel file. He brought the letter with him to campus three times before he was able to give it to Marchman, on the day of graduation. (It is unclear whether this was the same meeting as that on June 16.) The letter, dated June 11, 2006, expressed his belief he had been treated unfairly because he was HIV positive and stated: "Most recently, I was told that I was being removed from my current fulltime position and would be retained only part-time. I feel I am being treated differently because I disclosed my long term illness. As a result of this disclosure, I am now being forced to relinquish my health benefits, which will severely impact my health."

Marchman nodded while silently reading the letter and, when finished, said "[w]ell, this implies that we're discriminating." She tried to persuade Scotch not to have her put the letter in his file because potential employers might see it, but said if he insisted on her doing so, she would have to forward the letter to Lester and investigate.

In a letter dated July 3, 2006, Scotch informed Richman he would not return to his position at AIC. The letter stated: "As you know, the reduction to part-time status effective July 1st constitutes a drastic cut to my existing health benefits and level of income. With over 3 years of dedicated service to [Education Management] and the students of The Art Institute, this recent reduction of status leaves me with no other choice but to leave."

PROCEDURAL HISTORY

Scotch's first amended complaint (the operative pleading) alleged seven causes of action against AIC, Richman, Lester, and Marchman: (1) disability discrimination in violation of the FEHA; (2) failure to maintain a discrimination-free environment in violation of the FEHA; (3) failure to engage in the interactive process in violation of the FEHA; (4) failure to accommodate in violation of the FEHA; (5) wrongful termination of employment in violation of public policy; (6) retaliation in violation of the FEHA; and (7) intentional infliction of emotional distress.

The trial court granted AIC's, Richman's, Lester's, and Marchman's motions for summary judgment, and judgment was entered in their favor. After Scotch filed his notice of appeal, he entered into a stipulation with Marchman to abandon his appeal against her. Later, we granted Scotch's request to dismiss the appeal against Lester and Richman. Scotch does not challenge the judgment as to the seventh cause of action.

DISCUSSION

I.

*Overview of the FEHA*

■ *Discrimination*: The FEHA makes it an unlawful employment practice to discharge a person from employment or discriminate against the person in the terms, conditions, or privileges of employment, because of physical or mental disability or medical condition. (§ 12940, subd. (a).) The FEHA "does not prohibit an employer from . . . discharging an employee with a physical or mental disability, . . . where the employee, because of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations . . . ." (§ 12940, subd. (a)(1).) Physical disabilities under the FEHA include "chronic or episodic conditions such as HIV/AIDS." (§ 12926.1, subd. (c).)

■ The FEHA proscribes two types of disability discrimination: (1) discrimination arising from an employer's intentionally discriminatory act against an employee because of his or her disability (disparate treatment discrimination), and (2) discrimination resulting from an employer's facially neutral practice or policy that has a disproportionate effect on employees suffering from a disability (disparate impact discrimination). (*Knight v. Hayward Unified School Dist.* (2005) 132 Cal.App.4th 121, 128–129 [33 Cal.Rptr.3d 287].) Scotch asserted disparate treatment discrimination.

■ *Reasonable Accommodation*: The FEHA imposes on the employer the obligation to make reasonable accommodation: "It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California: [¶] . . . [¶] (m) For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." (§ 12940, subd. (m).) An employer is not required to make an accommodation "that is demonstrated by the employer or other covered entity to produce undue hardship to its operation." (*Ibid.*)

■ *Interactive Process*: The FEHA makes it unlawful for an employer "to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." (§ 12940, subd. (n).) Section 12940, subdivision (n) imposes separate duties on the employer to engage in the " 'interactive process' " and to make " 'reasonable accommodations.' " (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1193 [87 Cal.Rptr.3d 439]; see *Wysinger, supra*, 157 Cal.App.4th at pp. 424–425.)

■ *Retaliation*: The FEHA makes it unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (§ 12940, subd. (h).)

■ *Environment Free from Discrimination*: The FEHA makes it unlawful for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." (§ 12940, subd. (k).)

## II.

### Standard of Review and Burden-shifting Standard for Discrimination Claims

We review summary judgment de novo. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089] (*Guz*).) We independently determine whether the record supports the trial court's conclusion that the plaintiff's discrimination claims failed as a matter of law. (*Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 951 [62 Cal.Rptr.2d 142].)

■ California uses the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination based on a theory of disparate treatment. (*Guz, supra,* 24 Cal.4th 317, 354; see *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [36 L.Ed.2d 668, 93 S.Ct. 1817] (*McDonnell Douglas*).) "This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz, supra,* 24 Cal.4th at p. 354.)

Under the *McDonnell Douglas* test, the plaintiff has the initial burden of establishing a prima facie case of discrimination. (*Guz, supra,* 24 Cal.4th at p. 354.) To meet this burden, the plaintiff must, at a minimum, show the employer took actions from which, if unexplained, it can be inferred that it is more likely than not that such actions were based on a prohibited discriminatory criterion. (*Id.* at p. 355.) A prima facie case generally means the plaintiff must provide evidence that (1) the plaintiff was a member of a protected class, (2) the plaintiff was qualified for the position he or she sought or was performing competently in the position held, (3) the plaintiff suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests a discriminatory motive. (*Ibid.*)

If the plaintiff establishes a prima facie case, then a presumption of discrimination arises, and the burden shifts to the employer to rebut the presumption by producing admissible evidence sufficient to raise a genuine issue of material fact the employer took its actions for a legitimate, nondiscriminatory reason. (*Guz, supra,* 24 Cal.4th at pp. 355–356.) If the employer meets that burden, the presumption of discrimination disappears, and the plaintiff must challenge the employer's proffered reasons as pretexts for discrimination or offer other evidence of a discriminatory motive. (*Id.* at p. 356.)

As *Guz* explains, several decisions suggest that when an employee opposes an employer's motion for summary judgment of a discrimination claim, the employer must make the initial showing of no merit and the *McDonnell Douglas* burdens are reversed. (*Guz, supra,* 24 Cal.4th at pp. 356–357.) Other decisions suggest the plaintiff can survive the employer's summary judgment motion merely by presenting, at the outset, evidence satisfying the prima facie elements of *McDonnell Douglas*. (*Guz, supra,* 24 Cal.4th at p. 357.) *Guz* did not resolve the issue because the defendant in that case proceeded to the second step of the *McDonnell Douglas* test and produced admissible evidence sufficient to raise a genuine issue of material fact that its actions were taken for a legitimate, nondiscriminatory reason. (*Ibid.*)

█ In *Kelly, supra,* 135 Cal.App.4th 1088, the court explained the *Guz* standard in light of the California Supreme Court's decision in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826 [107 Cal.Rptr.2d 841, 24 P.3d 493]: "A defendant employer's motion for summary judgment slightly modifies the order of these [*McDonnell Douglas*] showings. If, as here, the motion for summary judgment relies in whole or in part on a showing of nondiscriminatory reasons for the discharge, the employer satisfies its burden as moving party if it presents evidence of such nondiscriminatory reasons that would permit a trier of fact to find, more likely than not, that they were the basis for the termination. (See *Aguilar v. Atlantic Richfield Co.*[, *supra,*] 25 Cal.4th [at pp.] 850–851 . . . ; cf. *Guz, supra,* 24 Cal.4th at p. 357.) To defeat the motion, the employee then must adduce or point to evidence raising a triable issue, that would permit a trier of fact to find by a preponderance that intentional discrimination occurred. (*Aguilar,* at pp. 850–851; *Guz,* at p. 357.) In determining whether these burdens were met, we must view the evidence in the light most favorable to plaintiff, as the nonmoving party, liberally construing her evidence while strictly scrutinizing defendant's." (*Kelly, supra,* 135 Cal.App.4th at pp. 1097–1098.) We agree with this formulation and apply it below.

## III.

### Claim for Discrimination in Violation of the FEHA

In the first cause of action, Scotch alleged disability discrimination in violation of section 12940, subdivision (a). The FEHA "does not prohibit an employer from . . . discharging an employee with a physical or mental disability, . . . where the employee, because of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations . . . ." (§ 12940, subd. (a)(1).)

#### A. *AIC's Initial Burden of Presenting Evidence of Nondiscriminatory Reason*

Under the *Kelly* standard, AIC had the initial burden in its summary judgment motion of presenting evidence of nondiscriminatory reasons for placing Scotch on part-time status. AIC met this initial burden. It presented evidence that Scotch received a PPAR score of 2.25, did not have a master's degree, and never enrolled in a master's degree program. AIC presented evidence that ACICS accreditation standards required all faculty members teaching upper division courses to have graduate degrees, professional degrees, or professional certification.

AIC also presented Richman's declaration stating it experienced declining enrollment in 2006, had to restructure its course schedule to offer fewer

course sections, and, as a result, between the spring and summer terms of 2006 had to change 10 faculty members from full-time to part-time status and asked seven faculty members to leave based on their failure to enroll in a master's degree program. Richman explained in his declaration how course assignments were made for the summer 2006 term, and Scotch presented no evidence contradicting the declaration. Richman explained that after filling the full-time schedules of faculty members with master's degrees or those actively enrolled in master's degree programs, there were not enough lower division course sections to assign Scotch five course sections. AIC thus showed legitimate reasons for its decision to assign Scotch fewer than five course sections for the summer 2006 term.

This evidence would permit a trier of fact to find, more likely than not, the stated reasons were the basis for placing Scotch on part-time status.

## B. *Scotch's Burden to Present Evidence of Discrimination*

Scotch was required to present sufficient evidence "raising a triable issue, that would permit a trier of fact to find by a preponderance that intentional discrimination occurred." (*Kelly, supra,* 135 Cal.App.4th at p. 1098.) To establish a prima facie case under the FEHA on grounds of physical disability, Scotch had to present evidence showing he suffered a physical disability within the meaning of the FEHA, he was otherwise qualified for his job, and he suffered an adverse employment action because of the physical disability. (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 432 [60 Cal.Rptr.3d 359]; *Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 868 [58 Cal.Rptr.3d 729].)

Scotch established, and AIC does not dispute, that he was HIV positive and therefore had a physical disability under the FEHA and that he suffered an adverse employment decision. AIC contends Scotch failed to present evidence creating triable issues as to whether he was otherwise qualified for the job (whether a master's degree really was a requirement) and whether he suffered an adverse employment action because of the physical disability (whether AIC's stated reason for reducing his course assignments was a pretext).

It is undisputed AIC is subject to ACICS accreditation standards, the ACICS accreditation standards require upper division courses be taught by faculty with graduate degrees or professional certification, and, at least by April 2006, AIC had determined to fully implement that standard starting with the summer 2006 term. Scotch did not have a master's degree and had not enrolled in a master's degree program by the time the adverse employment action was made. Scotch did not have professional certification in any

field. Thus, it is undisputed that Scotch was not qualified to teach upper division courses at AIC starting in the summer 2006 term.

■ In addition, Scotch failed to present evidence that " 'the employer's stated reason is either false or pretextual, or evidence that the employer acted with discriminatory animus, or evidence of each which would permit a reasonable trier of fact to conclude the employer intentionally discriminated.' " (*Faust v. California Portland Cement Co., supra,* 150 Cal.App.4th at p. 886.) An employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the reasons offered by the employer for the employment decision that a reasonable trier of fact could rationally find the reasons not credible, and thereby infer the employer did not act for the stated nondiscriminatory purpose. (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 75 [105 Cal.Rptr.2d 652].)

"Many courts have used the term 'pretext' in describing the employee's burden of persuading the court that the employer's proffered explanation is unworthy of belief. [Citations.] The United States Supreme Court has explained that 'pretext' refers to 'but for' causation. [Citation.] The employee need not show 'he would have in any event been rejected or discharged solely on the basis of his [protected status], without regard to the alleged deficiencies . . . .' [Citation.] In other words, '[w]hile a complainant need not prove that [discriminatory] animus was the sole motivation behind the challenged action, he must prove by a preponderance of the evidence that there was a "causal connection" between the employee's protected status and the adverse employment decision.' [Citation.]" (*Clark v. Claremont University Center* (1992) 6 Cal.App.4th 639, 665 [8 Cal.Rptr.2d 151], fn. omitted.)

Scotch argues the implementation of the ACICS accreditation standards and Richman's method of scheduling courses for summer 2006 were a pretext for discriminating against him. Pretext is shown, Scotch argues, by evidence establishing the master's degree requirement was new and he was not informed of it until April 2006, after he revealed to Marchman he was HIV positive.

We agree it is unclear when AIC implemented the master's degree requirement and so notified its faculty. In 2004, an AIC assistant dean informed its faculty members, including Scotch, that AIC was concerned about its accreditation and that half of them would have to receive master's degrees. The assistant dean stated the academic directors would contact those faculty members who would have to obtain master's degrees, and Scotch was not contacted. The first internal documentation of a master's degree requirement is an AIC faculty credential plan dated April 12, 2006, stating, "ALL upper division courses must be taught by faculty holding master[']s degrees, AND

at least 1/2 of ALL lower division courses at the institution must be taught by faculty at the master[']s level." In her April 20, 2006 e-mail, the AIC academic director for the interior design department told Scotch, "[d]ue to the ACICS visit, I can't have you teaching upper division I[nterior] D[esign] classes in the future until you get a Master[']s degree." Alan Cusolito, AIC's academic director of the industrial design department, testified in his deposition he believed he was not informed until April 2006 that a master's degree was required to teach an upper division course.

■ Any factual issue of the timing of the master's degree requirement, and of the notification of AIC's faculty of the requirement, is not material, however, because Scotch failed to show a causal link between his revelation he was HIV positive and AIC's decision to implement the master's degree requirement. He presented no evidence that any of the decision makers who decided to implement the master's degree requirement knew he was HIV positive. "An adverse employment decision cannot be made 'because of' a disability, when the disability is not known to the employer. Thus, in order to prove [a discrimination] claim, a plaintiff must prove the employer had knowledge of the employee's disability when the adverse employment decision was made. [Citations.] While knowledge of the disability can be inferred from the circumstances, knowledge will only be imputed to the employer when the fact of disability is the only reasonable interpretation of the known facts. 'Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations . . . .' [Citations.]" (*Brundage v. Hahn* (1997) 57 Cal.App.4th 228, 236–237 [66 Cal.Rptr.2d 830].)

Until March 15, 2006, Scotch had not disclosed to anyone at AIC he was HIV positive, referring to his disability as "personal health issues," "a cold," or "[s]trep throat." On that date, Scotch met with Marchman and told her he was HIV positive. He asked her to keep this information confidential for fear of a backlash. She agreed, and told Richman and Lester only that Scotch had a health condition. AIC submitted evidence that Richman and Lester did not know Scotch was HIV positive when the decision was made to assign him fewer than five course sections for the summer 2006 term. Scotch presented no contradictory evidence.

Scotch argues Marchman, who knew he was HIV positive, participated in the decision to reduce his course load. When an employment decision is influenced by several people, "a decision maker's ignorance does not 'categorically shield the employer from liability if other substantial contributors to the decision bore the requisite animus. [Citation.]' " (*Wysinger, supra,* 157 Cal.App.4th at p. 421.) When, on June 16, 2006, Scotch asked Marchman why AIC had not terminated his employment, she replied she "was involved

in this, that Melinda [Lester] and Larry [Richman] wanted to get rid of [him], but she was fighting for [him]." Scotch argues that comment demonstrates Marchman had worked with Lester and Richman in making the adverse employment decision and had revealed to them he was HIV positive. There is no evidence Marchman revealed to anyone that Scotch was HIV positive. The reasonable inference from the comment "she was involved with this" is that Marchman supported Scotch and opposed the decision to reduce his course section assignments, not that she bore discriminatory animus against him.

Proof that AIC's explanation for the adverse employment decision is nonpretextual includes undisputed evidence showing that, in late 2005 and in January 2006, Scotch was encouraged, if not warned, to pursue a master's degree—or at least to start the application process. He did not do so. Further, Scotch presented no evidence AIC assigned upper division courses for the summer 2006 term to faculty members without master's degrees or professional certifications, and presented no evidence to counter the evidence AIC experienced declining enrollment in spring 2006 and, in response, decreased its number of course sections. Scotch describes Richman's scheduling for the summer 2006 term as "creative," but submitted no evidence to counter Richman's declaration explaining how he made the scheduling decision pertaining to Scotch.

## C. *Conclusion*

Scotch thus failed to demonstrate " ' " 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' " ' " in AIC's reasons to assign him fewer than five course sections that a reasonable trier of fact could rationally find those reasons not credible. (*Morgan v. Regents of University of California, supra,* 88 Cal.App.4th at p. 75.) Scotch's discrimination claim depends on an inference, drawn solely from the timing of events, that AIC implemented the ACICS accreditation standard of requiring a master's degree to teach upper division courses, applied that standard to all faculty, and then made course assignments based on that accreditation requirement (and in light of a decrease in enrollment), in order to discriminate against him for being HIV positive—a fact known only to Marchman. A reasonable jury could not draw that inference, and neither do we.

IV.

*Claim for Failure to Make Reasonable Accommodation*

In the fourth cause of action, Scotch alleged AIC breached its duty to provide him a reasonable accommodation in violation of section 12940, subdivision (m). The elements of a failure to accommodate claim are (1) the

plaintiff has a disability under the FEHA, (2) the plaintiff is qualified to perform the essential functions of the position, and (3) the employer failed to reasonably accommodate the plaintiff's disability. (*Wilson v. County of Orange, supra,* 169 Cal.App.4th at p. 1192.)

## A. *Definition of Reasonable Accommodation*

 The term "reasonable accommodation" is defined in the FEHA regulations only by means of example: " 'Reasonable accommodation' may include either of the following: [¶] (1) Making existing facilities used by employees readily accessible to, and usable by, individuals with disabilities. [¶] (2) Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." (§ 12926, subd. (n); see Cal. Code Regs., tit. 2, § 7293.9, subd. (a); accord, 42 U.S.C. § 12111(9).)

 In *Nadaf-Rahrov, supra,* 166 Cal.App.4th at pages 975–976, the court, adopting the definition found in the federal Equal Employment Opportunity Commission (EEOC) interpretive guidance on the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.) (ADA), interpreted "reasonable accommodation" to mean "a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired." We agree with this definition. As the *Nadaf-Rahrov* court reasoned, "[b]ecause the California Legislature has modeled the reasonable accommodation requirements of section 12940[, subdivision ](m) and section 12940[, subdivision ](n) on the parallel federal requirements, the EEOC's definition of 'reasonable accommodation' appropriately guides our construction of the state laws." (*Nadaf-Rahrov, supra,* 166 Cal.App.4th at p. 975.)

## B. *Scotch's Proposed Accommodation*

In the March 23, 2006 meeting, Lester informed Scotch he could pursue a three-year master's degree program rather than a two-year program, and time spent working toward the master's degree would take the place of other professional development requirements. Scotch does not argue his disability would not have permitted him to perform his job duties with AIC's proposed accommodation; rather, he argues AIC's proposed accommodation was meaningless because Lester knew Scotch would be reduced to part-time status within a few weeks, long before he could even enroll in a master's degree program.

Scotch argues AIC should have offered the accommodation of giving him priority in assignment of courses to ensure he would teach five course

sections during the summer 2006 term. Citing *Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245 [102 Cal.Rptr.2d 55] (*Jensen*), Scotch argues he was entitled to such preferential consideration as a disabled employee.

In *Jensen*, the employee, a branch manager suffering from posttraumatic stress disorder caused by a bank robbery, requested the accommodation of reassignment to a different position or branch. (*Jensen, supra*, 85 Cal.App.4th at pp. 249–250.) The defendant employer asserted it could not accommodate the employee by reassigning her to other positions because she either lacked the required skills or qualifications, or there were others who were better qualified for the available positions. (*Id.* at p. 264.) The appellate court rejected that assertion because it "overlooks that when reassignment of an existing employee is the issue, the disabled employee is entitled to preferential consideration." (*Id.* at p. 265.) The court reversed summary judgment in the employer's favor, stating, "[h]aving failed to establish unequivocally that [the employee] was unqualified for any vacant position within the organization, summary judgment was inappropriate on this ground." (*Ibid.*)

Scotch is not claiming he should have been reassigned to a different position to accommodate his disability. He is claiming he should have been given priority in assignment of course sections to enable him to maintain his current full-time employment status and keep his medical benefits. His claim is more similar to that rejected in *Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215 [37 Cal.Rptr.3d 899] (*Raine*).

In *Raine*, the defendant employer reassigned an employee to a temporary light-duty position to accommodate the employee's injury while it healed. (*Raine, supra*, 135 Cal.App.4th at p. 1218.) The employee remained in that position for six years until his physician advised the employer the disability was permanent. (*Ibid.*) The employer told the employee it had no available permanent positions as a sworn police officer for someone with the employee's qualifications, and offered him a desk position as a civilian police technician. (*Id.* at p. 1219.) The employee declined the offer, took disability retirement, and sued the employer under the FEHA, contending the employer failed to reasonably accommodate his limitations by making his temporary position permanent. (*Raine, supra*, at p. 1219.) The Court of Appeal, affirming summary judgment in the employer's favor, held the employer had no obligation under the FEHA to make the temporary light-duty position available indefinitely once the employer learned the disability was permanent. (*Raine, supra*, at pp. 1217–1218.) The employee was entitled to a reasonable accommodation, which might include reassignment if a vacant position were open; the employer was not required, however, to create a new position by

making a temporary position permanent. (*Id.* at p. 1227.) Here, Scotch's proposed accommodation was akin to creation of a new employment position.[2]

Scotch does not argue his proposed accommodation comes within any of the examples of reasonable accommodation identified in section 12926, subdivision (n). His proposed accommodation is not reasonable under the definition we have adopted because it is not a "modification or adjustment to the workplace" necessary to enable him to perform the essential functions of his position. Unlike the employee in *Jensen*, Scotch was not requesting assignment from a position he could not manage to one he could. Instead, Scotch explained the limitations created by his disability were that he needed to avoid stress and he could not pursue a master's degree while teaching full time and fulfilling other professional development requirements—limitations addressed by AIC's accommodation. Scotch's request of priority in assignment of lower division courses does not accommodate those limitations and was unnecessary to enable him to perform the essential functions of his position.

## C. *Conclusion*

The accommodation offered by AIC—three years to complete a master's degree program and time spent working on a master's degree replacing professional development requirements—did not guarantee Scotch immediate full-time employment, but was "a modification or adjustment to the workplace" that would have enabled Scotch "to perform the essential functions of the job held or desired." (*Nadaf-Rahrov, supra*, 166 Cal.App.4th at p. 976.) Scotch's disqualification from teaching upper division courses did not stem from his disability, or failure to accommodate that disability, but rather from his not having a master's degree or being enrolled in a master's degree program. The accommodation that Scotch requests—priority in assignment of lower division courses—is the same "accommodation" any AIC faculty member without a master's degree would need in order to be ensured enough course sections to maintain full-time employment. The trial court was correct to grant summary judgment in AIC's favor on Scotch's failure to accommodate claim.

---

[2] Scotch does not contend AIC was contractually required to keep him or any faculty member at full-time status. His letter of appointment, dated April 1, 2006, gave AIC the discretion to change his employment status if enrollment declined: "It is the intention of [AIC] to continue your full-time appointment during each quarter of this appoint[ment] year pending satisfactory job performance and course availability. In the event of an enrollment shortfall that requires a reduction in staffing, retention of faculty will be based on a combination of professional expertise, credentials appropriate to respective curricular areas, the school's assessment of job performance and length of service. The determination will be at the discretion of the school."

## V.

### *Claim for Failure to Engage in Interactive Process*

In the third cause of action, Scotch alleged AIC failed to engage in an "interactive process" as required under section 12940, subdivision (n). "The 'interactive process' required by the FEHA is an informal process with the employee or the employee's representative, to attempt to identify a reasonable accommodation that will enable the employee to perform the job effectively. [Citation.] Ritualized discussions are not necessarily required." (*Wilson v. County of Orange, supra,* 169 Cal.App.4th at p. 1195.)

### A. *Obligations Imposed by Interactive Process*

The interactive process imposes burdens on both the employer and employee. The employee must initiate the process unless the disability and resulting limitations are obvious. "Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, . . . the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." (*Taylor v. Principal Financial Group, Inc.* (5th Cir. 1996) 93 F.3d 155, 165.)

"[I]t is important to distinguish between an employer's knowledge of an employee's disability versus an employer's knowledge of any limitations experienced by the employee as a result of the disability. This distinction is important because the ADA requires employers to reasonably accommodate limitations, not disabilities." (*Taylor v. Principal Financial Group, Inc., supra,* 93 F.3d at p. 164.) "Although it is the employee's burden to initiate the process, no magic words are necessary, and the obligation arises once the employer becomes aware of the need to consider an accommodation." (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 62, fn. 22 [43 Cal.Rptr.3d 874] (*Gelfo*).)

Once the interactive process is initiated, the employer's obligation to engage in the process in good faith is continuous. "[T]he employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed. This rule fosters the framework of cooperative problem-solving contemplated by the ADA, by encouraging employers to seek to find accommodations that really work . . . ." (*Humphrey v. Memorial Hospitals Ass'n* (9th Cir. 2001) 239 F.3d 1128, 1138.)

Both employer and employee have the obligation "to keep communications open" and neither has "a right to obstruct the process." (*Jensen, supra*, 85 Cal.App.4th at p. 266.) "Each party must participate in good faith, undertake reasonable efforts to communicate its concerns, and make available to the other information which is available, or more accessible, to one party. Liability hinges on the objective circumstances surrounding the parties' breakdown in communication, and responsibility for the breakdown lies with the party who fails to participate in good faith." (*Gelfo, supra*, 140 Cal.App.4th at p. 62, fn. 22.)

## B. *Whether Scotch Initiated the Interactive Process*

AIC argues, "[a]ny alleged failure by [AIC] to engage in the interactive process was Scotch's fault" because Scotch never informed Richman, Lester, or Marchman he was disabled and had resulting limitations on his ability to perform his job functions. While it is undisputed Scotch did not reveal he was HIV positive until he met with Marchman on March 15, 2006, he did tell Richman by e-mail in November 2005: "[L]ast year I made you aware of some personal health issues that limited my schedule. These health issues make it difficult for me to handle a full-time job, outside projects and multiple co[u]rse loads at the same time. It is imperative that I maintain a reasonable limit on my commitments in order to maintain my person[al] safeguards." On March 15, 2006, Scotch told Richman he was unhappy with his evaluation and PPAR score and informed him he had a "long-term illness" affecting his job performance and ability to pursue a master's degree.

Although it is disputed whether Scotch told Marchman his condition did not affect his job performance or ability to perform his job, Scotch presented undisputed evidence he told Marchman he needed to avoid stress. Marchman told Richman and Lester that Scotch had a health condition. In the March 23 meeting with Lester, Scotch focused the discussion on pursuing a master's degree because that is what Marchman advised him to do.

This evidence is sufficient to show Scotch initiated the interactive process and, by March 23, AIC had become "aware of the need to consider an accommodation." (*Gelfo, supra*, 140 Cal.App.4th at p. 62, fn. 22.)

AIC argues it engaged in the interactive process "by listening and responding to Scotch's requests for clarification and by not scheduling him to teach morning sessions." It is undisputed Richman agreed in late 2005 not to schedule Scotch to teach morning classes. It is also undisputed Lester suggested to Scotch in their meeting on March 23 that he enroll in a three-year master's degree program rather than a two-year program and told

him the time spent working toward a master's degree would take the place of other professional development requirements. Scotch expressed satisfaction with that response. He did not request any further accommodation.

C. *Whether AIC Should Have Initiated a Second Meeting*

Scotch contends AIC did not engage in the interactive process in good faith because (1) it changed his employment status to part time before scheduling a second meeting, as promised at the March 23, 2006 meeting, and (2) the accommodation offered at the March 23 meeting was meaningless because Lester knew Scotch would be reduced to part-time status within a few weeks, long before he could even enroll in a master's degree program.

As we explained in addressing Scotch's failure to accommodate claim, the accommodation offered at the March 23 meeting was not meaningless, but was reasonably directed to accommodating the limitations created by his disability.

The second meeting promised at the March 23 meeting was never held. AIC contends a second meeting was not held because Scotch expressed satisfaction with the first meeting and never asked for another one. Scotch contends AIC did not have a second meeting because it decided to reduce his employment status to part time instead. Further, after Scotch presented Marchman with the June 11, 2006 letter, AIC did not conduct an investigation and did not seek to reopen the interactive process.

A reasonable jury could find AIC should have initiated a second meeting with Scotch before deciding to reduce the number of course sections assigned to him and effectively changing his employment status to part time. Richman and Lester knew Scotch had a serious disability (Marchman knew he was HIV positive) and would know that he would lose his medical benefits if he became a part-time employee. A reasonable jury could find AIC, rather than Scotch, had the burden of initiating a second meeting because AIC uniquely had knowledge of the implementation of the master's degree requirement and of the scheduling assignments for the summer 2006 term.

D. *Materiality: Is Scotch Required to Identify a Reasonable, Available Accommodation to Recover for Failure to Engage in the Interactive Process?*

Was AIC's failure to engage in the interactive process material? To recover under section 12940, subdivision (n), was Scotch required to identify a reasonable, available accommodation that the second meeting or subsequent one might have produced? If so, at what stage was Scotch required to identify a reasonable, available accommodation?

1. Wysinger, Nadaf-Rahrov, *and* Claudio

In 2007, in *Wysinger, supra,* 157 Cal.App.4th 413, 424–425, a panel of Division Six of the Court of Appeal, Second Appellate District, concluded an employee may prevail on a claim for failure to engage in the interactive process without prevailing on a claim for failure to make reasonable accommodation. The panel reasoned a good faith interactive process was necessary to determine what reasonable accommodations were available: "An employer may claim there was no available reasonable accommodation. But if it did not engage in a good faith interactive process, 'it cannot be known whether an alternate job would have been found.' [Citation.] The interactive process determines which accommodation is required. [Citations.] Indeed, the interactive process could reveal solutions that neither party envisioned." (*Ibid.*) Because an employee does not have extensive access to information concerning possible accommodations, an employer could limit its own liability by withholding information that could lead to a reasonable accommodation. (*Id.* at p. 425.)

In 2008, in *Nadaf-Rahrov, supra,* 166 Cal.App.4th 952, 984, a panel of Division Five of the Court of Appeal, First Appellate District, disagreed with *Wysinger* and concluded, "the availability of a reasonable accommodation (i.e., a modification or adjustment to the workplace that enables an employee to perform the essential functions of the position held or desired) is necessary to a section 12940[, subdivision ](n) claim." The panel cited federal cases under the ADA holding an employer may be liable for failure to engage in the interactive process only if a reasonable accommodation was available, and concluded the Legislature intended section 12940, subdivision (n) to be interpreted in the same manner. (*Nadaf-Rahrov, supra,* at pp. 980–981.)

The *Nadaf-Rahrov* panel criticized *Wysinger* as based on the erroneous assumption that section 12940, subdivisions (m) and (n) were intended to address the same situation. The *Nadaf-Rahrov* panel explained: "If a failure to provide accommodations is a consequence of a section 12940[, subdivision ](n) violation, we see no reason why a plaintiff could not recover damages for that failure to accommodate, even if the plaintiff prevailed only on a section 12940[, subdivision ](n) claim. Such a construction does not, as *Wysinger* states, render section 12940[, subdivision ](n) superfluous. Section 12940[, subdivision ](m) applies even without a showing that the employer failed to engage in the interactive process. Where a necessary accommodation is obvious, where the employee requests a specific and available reasonable accommodation that the employer fails to provide, or where an employer participates in a good faith interactive process and identifies a reasonable accommodation but fails to provide it, a plaintiff may sue under section 12940[, subdivision ](m). Section 12940[, subdivision ](n),

which requires proof of failure to engage in the interactive process, is the appropriate cause of action where the employee is unable to identify a specific, available reasonable accommodation while in the workplace and the employer fails to engage in a good faith interactive process to help identify one, *but the employee is able to identify a specific, available reasonable accommodation through the litigation process.* In short, the two causes of action address different factual circumstances." (*Nadaf-Rahrov, supra,* 166 Cal.App.4th at p. 984, italics added.)

Both *Wysinger* and *Nadaf-Rahrov* cited *Claudio, supra,* 134 Cal.App.4th 224. In that case, a panel of the Third District Court of Appeal, reviewing summary judgment in the employer's favor on a section 12940, subdivision (n) claim, held, "since we conclude a triable issue exists concerning failure by the [employer] to participate in the interactive process, the judgment cannot be affirmed on the ground that no alternate jobs were available." (*Claudio, supra,* at p. 248.) Because the employer failed to participate in the interactive process, "it cannot be known whether an alternate job would have been found." (*Id.* at p. 245.) In the summary judgment proceeding, the employer failed to show that no accommodation was available, asserting instead that the employee rejected participation in the interactive process. The *Claudio* panel stated: "The [employer] assert[s] plaintiff was totally disabled and therefore the only accommodation that could have been at issue, if plaintiff participated in the interactive process, was an unlimited extension of his leave of absence. However, as is apparent from our recitation of the record, it is not at all clear that this is true. At a minimum, it appears plaintiff may have been physically able to handle clerical positions. Thus, this is not a case (at least not yet) where it can be said an interactive process would have been futile. (Cf. *Swonke v. Sprint, Inc.* (2004) 327 F.Supp.2d 1128, 1137 [interactive process would have been futile because plaintiff was totally disabled from any employment].)" (*Claudio, supra,* 134 Cal.App.4th at p. 249.)

*Wysinger* cited *Claudio* as supporting the proposition that evidence showing no alternate jobs were available for the employee did not preclude recovery for failure to engage in the interactive process. (*Wysinger, supra,* 157 Cal.App.4th at p. 426.) The panel in *Nadaf-Rahrov* concluded *Claudio* was not inconsistent with its interpretation of section 12940, subdivision (n) because "[t]he phrase 'at least not yet' suggests that it might become apparent later in the litigation (i.e., on remand) that the interactive process *was* futile because no reasonable accommodation would have been available and that the employer then would not be held liable for failing to engage in a futile interactive process." (*Nadaf-Rahrov, supra,* 166 Cal.App.4th at p. 983.)

*Wysinger, Nadaf-Rahrov,* and *Claudio* do not address the situation presented here, where the initial accommodation was reasonable, but the employer failed to carry out its promise to continue the interactive process, and the adverse employment action was taken after the initial accommodation was offered. In *Wysinger,* the parties never reached the stage of deciding which accommodations were required because the employer refused to engage in the interactive process altogether. (*Wysinger, supra,* 157 Cal.App.4th at p. 425.) The basis for the decision in *Claudio* was the employer had refused to communicate with the employee through his attorney, and therefore failed to engage in the interactive process. (*Claudio, supra,* 134 Cal.App.4th at pp. 247–248.)

## 2. *Reconciliation of* Wysinger, Nadaf-Rahrov, *and* Claudio

*Wysinger, Nadaf-Rahrov,* and *Claudio* are not entirely inconsistent and can be reconciled. All three cases recognize the employee does not have the same access to information as the employer and therefore the interactive process is important in determining what accommodations are available. The *Nadaf-Rahrov* court pointed out that *Wysinger* did not explain the appropriate remedy for failure to engage in the interactive process "in the absence of a failure to accommodate" under section 12940, subdivision (m). (*Nadaf-Rahrov, supra,* 166 Cal.App.4th at p. 983, fn. 13.) The *Wysinger* panel did not have to explain the remedy because it was reviewing a jury verdict finding the employer liable for retaliation against the employee for filing an age discrimination claim. (*Nadaf-Rahrov, supra,* at p. 983, fn. 13.)

 We synthesize *Wysinger, Nadaf-Rahrov,* and *Claudio* with our analysis of the law as follows: To prevail on a claim under section 12940, subdivision (n) for failure to engage in the interactive process, an employee must identify a reasonable accommodation that would have been available at the time the interactive process should have occurred. An employee cannot necessarily be expected to identify and request all possible accommodations during the interactive process itself because " ' "[e]mployees do not have at their disposal the extensive information concerning possible alternative positions or possible accommodations which employers have. . . ." ' " (*Wysinger, supra,* 157 Cal.App.4th at p. 425.) However, as the *Nadaf-Rahrov* court explained, once the parties have engaged in the litigation process, to prevail, the employee must be able to identify an available accommodation the interactive process should have produced: "Section 12940[, subdivision ](n), which requires proof of failure to engage in the interactive process, is the appropriate cause of action where the employee is unable to identify a specific, available reasonable accommodation while in the workplace and the employer fails to engage in a good faith interactive process to help identify

one, but the employee is able to identify a specific, available reasonable accommodation through the litigation process." (*Nadaf-Rahrov, supra*, 166 Cal.App.4th at p. 984.)

This reconciliation is consistent with federal cases. For example, in *Willis v. Conopco, Inc.* (11th Cir. 1997) 108 F.3d 282, 287, the Eleventh Circuit Court of Appeals explained that under the ADA it would be unfair to expect an employee in the workplace to unilaterally identify reasonable accommodations, but in litigation, the employee has discovery tools available to learn what accommodations might have been discussed during the interactive process. "Whatever may be said of [the employee's] 'burden' as an employee in the day-to-day workplace seeking an accommodation for her condition, [the employee]—as a litigant bringing an ADA action—has failed to produce evidence (after the *completion* of discovery) of the existence of any 'accommodation' at all, 'reasonable' or otherwise." (*Willis v. Conopco, Inc., supra*, at p. 287.)

In this case, the parties have conducted extensive and thorough discovery, including the depositions of Scotch, Richman, Lester, Marchman and other AIC faculty and administration, and document productions. Expert witnesses have been retained. Voluminous summary judgment papers were prepared and filed. Yet, after this extensive process, the only accommodation Scotch identifies that should have been offered to him was priority in assignment of lower division courses—an accommodation which, we have concluded, is not reasonable and not directed to the limitations created by his disability.

Put another way, if this case were presented to a jury, what remedy could it provide? How was Scotch damaged by any failure by AIC to engage in the interactive process in good faith? The FEHA has a remedial rather than punitive purpose. (§ 12920; see *Nadaf-Rahrov, supra*, 166 Cal.App.4th at pp. 981–982.) Unless, after litigation with full discovery, Scotch identifies a reasonable accommodation that was objectively available during the interactive process, he has suffered no remedial injury from any violation of section 12940, subdivision (n).

E. *Conclusion*

After complete discovery in the litigation process, Scotch has not shown that a reasonable accommodation, directed to the limitations created by his disability, was available during the time period during which the interactive process should have occurred.

VI.

*Claim for Retaliation*

In the sixth cause of action, Scotch alleged retaliation in violation of the FEHA, section 12940, subdivision (h). To establish a prima facie case of retaliation under the FEHA, a plaintiff must show "(1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 [32 Cal.Rptr.3d 436, 116 P.3d 1123].)

Scotch presented evidence showing the first two elements. He engaged in protected activity by telling Lester at the March 23, 2006 meeting he believed he was the victim of "some kind of weird retaliation" and by presenting Marchman with the June 11, 2006 letter. He was subjected to an adverse employment action when his course assignments were reduced, with the effect his employment status was changed from full time to part time.

Scotch argues the temporal proximity of the protected action and the adverse employment action is sufficient evidence to show a causal link. "Close proximity in time of an adverse action to an employee's resistance or opposition to unlawful conduct is often strong evidence of a retaliatory motive." (*Taylor v. City of Los Angeles Dept. of Water & Power* (2006) 144 Cal.App.4th 1216, 1235 [51 Cal.Rptr.3d 206]; see also *Villiarimo v. Aloha Island Air, Inc.* (9th Cir. 2002) 281 F.3d 1054, 1065 ["in some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity"].)

In *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 477–478 [4 Cal.Rptr.2d 522], the court held that evidence the employee's employment was terminated only a few months after the protected activity, after working for the employer for four years, was sufficient circumstantial evidence of a causal link. In *Strother v. S. Cal. Permanente Medical Group* (9th Cir. 1996) 79 F.3d 859, 869–870, the court concluded evidence the employee suffered an adverse employment action one day after she filed a discrimination charge was sufficient for the trier of fact to conclude the employer's action was caused by the protected activity. Similarly, evidence showing Scotch suffered an adverse employment action weeks after the meetings with Marchman and Lester was sufficient to make a prima facie showing of causation.

By establishing a prima facie case of retaliation, Scotch shifted the burden to AIC of showing a legitimate, nonretaliatory reason for the adverse employment action. (*Akers v. County of San Diego* (2002) 95 Cal.App.4th

1441, 1453 [116 Cal.Rptr.2d 602].) For the reasons we have explained, AIC met its burden. The burden therefore shifted back to Scotch to prove intentional retaliation. (*Ibid.*) Scotch did not meet that burden: He failed to submit evidence showing AIC's reasons were a pretext and the decision to reduce his course assignments had a retaliatory motive.

When Scotch applied for unemployment benefits, he informed the Employment Development Department (EDD), "I quit because they want me to work part time and I need to work full time." In response to Scotch's application for unemployment benefits, Marchman informed the EDD: "He went from [full time] @ 5 classes to [part time] teaching 4 classes. Changing to [part time] means the employee has the option to keep his benefits going." Scotch contends that statement is false and the falsity demonstrates retaliatory motive. The assertion that Scotch's employment status changed from full time to part time was true, and, though initially assigned three course sections for the summer 2006 term, he later was given a fourth section. As Scotch explains, his option to maintain his health benefits was through the Consolidated Omnibus Budget Reconciliation Act of 1985 system; however, Marchman's statement to the EDD that he had the option to keep those benefits is incomplete rather than false. A reasonable trier of fact could not draw a reasonable inference of retaliatory motive from Marchman's response to Scotch's application for unemployment benefits.

## VII.

### Claim for Failure to Maintain Environment Free from Discrimination

In the second cause of action, Scotch alleged failure to provide an environment free from discrimination in violation of the FEHA, section 12940, subdivision (k). An actionable claim under section 12940, subdivision (k) is dependent on a claim of actual discrimination: "Employers should not be held liable to employees for failure to take necessary steps to prevent such conduct, except where the actions took place and were not prevented." (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289 [73 Cal.Rptr.2d 596].)

Scotch concedes "the 'Failure to Maintain' cause of action can survive only if a 'Retaliation' cause of action survives." Because we affirm summary judgment on all of Scotch's FEHA causes of action, we also affirm summary judgment on the failure to provide an environment free from discrimination cause of action.

## VIII.

### Claim for Termination of Employment in Violation of Public Policy

In the fifth cause of action, Scotch alleged AIC constructively discharged him from employment in violation of public policy. "Apart from the terms of an express or implied employment contract, an employer has no right to terminate employment for a reason that contravenes fundamental public policy as expressed in a constitutional or statutory provision." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252 [32 Cal.Rptr.2d 223, 876 P.2d 1022] (*Turner*).)

"[T]o establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Turner, supra,* 7 Cal.4th at p. 1251.) Whether conditions were so intolerable or aggravated under that standard is usually a question of fact; however, summary judgment against an employee on a constructive discharge claim is appropriate when, under the undisputed facts, the decision to resign was unreasonable as a matter of law. (See *Soules v. Cadam, Inc.* (1991) 2 Cal.App.4th 390, 400 [3 Cal.Rptr.2d 6], disapproved on another ground in *Turner, supra,* 7 Cal.4th at p. 1251; *King v. AC & R Advertising* (9th Cir. 1995) 65 F.3d 764, 767 (*King*).)

"The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." (*Turner, supra,* 7 Cal.4th at p. 1246.)

A poor performance rating, accompanied by a demotion and reduction in pay, does not constitute a constructive discharge. (*Turner, supra,* 7 Cal.4th at p. 1247; *King, supra,* 65 F.3d at pp. 767–768.) In *King,* the employer offered the employee a compensation package reducing the employee's salary and changed his annual bonus from a fixed to a performance based amount. The employee rejected the offer and sued the employer for age discrimination premised on constructive discharge. (*King, supra,* at p. 767.) Based on *Turner,* the Ninth Circuit Court of Appeals affirmed summary judgment in the employer's favor, concluding, "the undisputed facts are insufficient to prove

the required intolerable or aggravated work conditions," and, therefore, the employee's decision to resign was unreasonable as a matter of law. (*King, supra,* at p. 769.)

On the undisputed facts of this case, Scotch was not constructively discharged as a matter of law. AIC did not change Scotch's working conditions or make it difficult for him to perform his job functions. There is no evidence he was shunned, treated harshly, or subjected to epithets and scorn. Scotch's appointment letter informed him AIC might change his employment status to part time in the case of enrollment decline. Under the *Turner* standard, a reasonable employer would not have realized a reasonable person in Scotch's position would be compelled to resign.

DISPOSITION

The judgment is affirmed. In the interest of justice, neither party may recover costs incurred on appeal.

Rylaarsdam, Acting P. J., and Bedsworth, J., concurred.