Filed 4/5/16  Williams v. Los Angeles County Metropolitan Transp. Authority CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ROBERT WILLIAMS, | B254997 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC467568) |
| v. | |
| LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Holly E. Kendig, Judge.  Affirmed.

Schuler & Brown, Jack M. Schuler, Tina Javaherian; Greines, Martin, Stein & Richland, Martin Stein, Alison Turner and Carolyn Oill for Defendant and Appellant.

The Mirroknian Law Firm, Reza Mirroknian and Peter A. Javanmardi for Plaintiff and Respondent.

# INTRODUCTION

A jury found in favor of plaintiff and respondent Robert Williams and against defendant and appellant the Los Angeles County Metropolitan Transportation Authority (MTA) on Williams's disability discrimination-related claims under California's Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).[1] The MTA appeals from the judgment, raising claims of, among other things, prejudicial instructional error and insufficiency of the evidence. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Factual background.

Williams began working for the MTA as a bus operator in 1997. Before that, he graduated from high school and took some college courses. He also had various jobs: a military operator room technician; taking care of hospital patients as a "medic"; making cabinets; delivering mail for the post office for seven years; making and serving drinks at a coffee company; and the Union Rescue Mission's volunteer office manager, which required him to use computers and copiers, to make reports and communicate with management, and to train and supervise new employees.

When he was working at the MTA, a truck rear-ended Williams's bus, injuring him.[2] He missed work but returned and was assigned 60 days of light duty; namely, clerical work, including "inputting data," "checking the computer," and helping coworkers. After the 60 days, Williams returned to driving a bus. But his condition worsened, until, in June 2007, his wrist, neck and back pain rendered it unsafe for him to operate a bus. He went on disability leave.[3] From the time Williams went on leave on June 7, 2007 until November 2008, the MTA never contacted him about finding him a different job.

---

[1]    All undesignated statutory references are to the Government Code.

[2]    It is unclear when the injury occurred.

[3]    Before Williams stopped working, he went through presupervisory training and received a certificate from the MTA in April 2007.

2

In November 2008, Williams saw a job posting for a MTA customer information agent. Williams's doctor, Dr. Daniel Capen, said Williams could do the job, which entailed helping customers with schedules or directions. Williams applied for the job online and was interviewed. He didn't get the job, because, according to his MTA interviewers, Williams couldn't "communicate." Williams also applied for a service attendant job cleaning out buses. Although Williams felt he could do the job, he was told he didn't meet the job requirements. Williams also felt he could be a schedule checker, which required sitting and entering data into a handheld device, or an "ambassador" helping customers at the ticket machine.

Jackie Anderson, the MTA's return to work coordinator, monitored occupational leaves. The only way Williams could come back as a bus operator was if he obtained "a release with no restrictions." Anderson returns disabled employees to work "when they have modified duty work restrictions." If they have a permanent work restriction, she refers them to the interactive process. According to her, "temporarily totally disabled" (TTD), is a workers' compensation term of art meaning unable to work in any capacity, in which case the MTA does not engage in the interactive process. If a person is TTD, then they are ineligible "to engage in the interactive process because there's no permanent work restriction." But, according to Dr. Capen, one can be TTD from a usual job but still perform other jobs with restrictions.

From June 2007 to October 2009, Anderson didn't see if Williams could perform any position other than bus operator because the attending physician statements from Dr. Capen during that time period said Williams was TTD.[4] Anderson denied seeing physician progress reports (PR-2s) from Dr. Capen dated September 29, 2008,

---

[4] Dr. Capen's testimony was unclear about what work, if any, Williams could perform during this period. The doctor testified both that, until July 20, 2009, Williams could not do any work, *and* that he could do customer service type work.

3

November 3, 2008, December 1, 2008, December 29, 2008, and July 20, 2009, indicating that Williams could return to modified work in customer service.[5]

On July 20, 2009, Dr. Capen said that Williams was "able to return to work with restrictions," "Office work only; No lifting over 5lbs. with right hand."  But in July and August 2009, Anderson made no effort to look for office work for Williams "because he was still unable to return to work as a bus operator."  She didn't make such an effort "because it wasn't a permanent job.  This was a temporary on a modified duty basis."

Not until October 7, 2009 was Williams referred to Emily Matias, who handled the MTA's interactive process to determine if a disabled employee can be brought back to work.  The process looks for reasonable accommodations, including alternate or modified type work.  The MTA's policy limits the interactive process to a maximum of six months.

Williams and Matias met once, for about 30 minutes.  Matias noted that Williams might qualify for customer information agent, "clerical," and "schedule checker."[6]  Matias told Williams she would send him weekly job updates.  Thus, from about October 2009 until the end of April 2010, Matias sent Williams a weekly letter saying there were no updates and no new list of jobs.  Other than these letters, Matias did not contact either Williams or Dr. Capen.  Matias did not consider Williams for "internal" job postings.  When there is a vacancy within a union, the union posts the job "internally," meaning it is open first to their members, and only members of that union may apply.  If, after the "internal bidding process," the position is not filled, then the position is opened "externally."  During this time, Williams continued to check the MTA's website for job postings.

---

[5]    PR-2s are sent to the worker's compensation carrier, but, in Dr. Capen's experience, they are "almost all of the time" also sent to the parties involved in the case.

[6]    She also wrote that he would not meet requirements of schedule checker because of his work restrictions.

Per the MTA's six month policy, Williams's interactive process was from October 2009 to April 2010. Not a single job was found for Williams during that time.

From the time Williams's interactive process ended in April 2010 until June 2011, the MTA did not engage in any interactive process and didn't look for other jobs for Williams. Instead, in April 2011, the MTA held a hearing to discuss his "separation" or termination from the MTA. Williams saw Dr. Capen, who on April 25, 2011, cleared Williams to return to work as a bus operator on a trial basis. But the MTA decided not to let Williams return as a bus operator on a trial basis. Williams made it clear he wanted to return to work. He was told, however, to get a release from his doctors saying he could return to work without restrictions as a bus driver.

The MTA fired Williams in June 2011. After being fired, Williams had various jobs, including medical supply technician and an "office job" at the Veteran's Administration that required him to go into the field to work with homeless veterans.

## II. Procedural background.

The case went to the jury on Williams's theories that the MTA discriminated against him based on his disability, denied him reasonable accommodations for his disabilities, failed to engage with him in a timely and good faith interactive process, and retaliated against him for filing a complaint with the EEOC.[7]

On December 16, 2013, the jury returned a special verdict in Williams's favor on all of his causes of action,[8] except for retaliation. The jury awarded $498,098.08 in damages to Williams.

This timely appeal followed.

---

[7] The jury found against Williams on his retaliation cause of action, which is not an issue on appeal.

[8] To the extent the reporter's transcript suggests an error in the polling of the jury, no objection was made below and no issue regarding the polling has been raised on appeal.

5

## CONTENTIONS

The MTA contends there were multiple prejudicial instructional errors, that there was insufficient evidence to support the jury's verdict, and that it was prejudicial error to admit e-mails between MTA employees.

## DISCUSSION

### I.    The FEHA overview.

The FEHA makes it an unlawful employment practice to discharge a person from employment or to discriminate against the person because of physical or mental disability or medical condition.  (§ 12940, subd. (a).)  The FEHA proscribes, for example, discrimination arising from an employer's intentionally discriminatory act against an employee because of the employee's disability (disparate treatment discrimination). (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1002 (*Scotch*).)  The FEHA also obligates employers to make reasonable accommodation for the known physical or mental disability of an employee.  (§ 12940, subd. (m); *Scotch*, at p. 1003.) But an employer is not required to make an accommodation "that is demonstrated by the employer or other covered entity to produce undue hardship . . . to its operation." (§ 12940, subd. (m); *Scotch*, at p. 1003.)  Reasonable accommodations may include job restructuring, part-time or modified work schedules, reassignment to a vacant position, and adjustment or modifications of examinations, training materials or policies. (§ 12926, subd. (p)(2); Cal. Code Regs, tit. 2, § 11068, subd. (d).)

The employer shall also engage in a timely, good faith, interactive process with the employee to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee with a known physical or mental disability or known medical condition.  (§ 12940, subd. (n); see also Cal. Code Regs, tit. 2, § 11069; *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 61-62 [the interactive process is at the heart of the FEHA's process, and is the primary vehicle for identifying and achieving effective adjustments to allow disabled employees to continue working without placing an undue burden on employers].)

6

## II.     Instructional error.

The MTA contends that the trial court erred by refusing to instruct the jury that plaintiff had the burden of proving he was "able *and qualified*" for positions, refusing to instruct that plaintiff had the burden of proving the availability of a reasonable accommodation, instructing the jury that the interactive process had "no limit," and refusing to instruct that the MTA was not required to violate someone else's rights under union contracts to accommodate plaintiff. After setting forth the standard of review, we discuss each contention.

### A.     *Standard of review.*

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) But " 'it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition. [Citations.]' [Citation.] Finally, '[e]rror cannot be predicated on the trial court's refusal to give a requested instruction if the subject matter is substantially covered by the instructions given.' " (*Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 359-360.)

Instructional error in a civil case is not inherently prejudicial. (*Soule, supra,* 8 Cal.4th at p. 580; *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983.) Rather, the "reviewing court should consider not only the nature of the error, 'including its natural and probable effect on a party's ability to place his full case before the jury,' but the likelihood of actual prejudice as reflected in the individual trial record, taking into account '(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled.' [Citation.]" (*Rutherford*, at p. 983.)

We review de novo whether a challenged jury instruction correctly states the law. (*Bowman v. Wyatt* (2010) 186 Cal.App.4th 286, 298.) We independently review claims

7

of instructional error viewing the evidence in the light most favorable to the appellant. (*Orichian v. BMW of North America, LLC* (2014) 226 Cal.App.4th 1322, 1333.)

   B. *The trial court did not err by refusing to amplify the CACI instructions*.

The jury was instructed with CACI Nos. 2540 and 2541[9] that Williams had to prove he "was *able* to perform the essential job duties with reasonable accommodation of his physical disability." (Italics added.) The trial court refused to amplify the instructions by giving the MTA's proposed instruction: "In order to assert employment discrimination, a plaintiff must provide evidence that he was *qualified* for the position he sought." (Italics added.) We find no prejudicial error.

The FEHA requires the plaintiff to prove he or she is able— in the physical sense *and* in the sense that he or she has the qualifications for the job—to perform the essential functions of the position sought. (*Bates v. United Parcel Service, Inc.* (9th Cir. 2007) 511 F.3d 974, 990 [under the ADA, a plaintiff must prove he or she has the requisite skill, experience, education and other job-related requirements of the position *and* he or she can perform the position's essential functions with or without reasonable

---

[9]   CACI No. 2540, for example, instructed the jury: "Robert Williams claims that the MTA wrongfully discriminated against him based on his disability or the perception that he was disabled. To establish this claim, Robert Williams must prove all of the following:
   "1. That the MTA was an employer;
   "2. That Robert Williams was an employee of the MTA for a job;
   "3. That the MTA knew that Robert Williams had a physical disability that limited his ability to work . . . .
   "4. That Robert Williams was able to perform the essential job duties with reasonable accommodation of his physical disability;
   "5. That the MTA refused to allow Robert Williams the opportunity to work and eventually terminated his employment;
   "6. That Robert Williams' physical disability, or alternatively MTA's belief that Robert Williams suffered from a physical disability, was a substantial motivating reason for the MTA to refuse Robert Williams the opportunity to work;
   "7. That Robert Williams was harmed; and
   "8. That the MTA's conduct was a substantial factor in causing Robert Williams' harm."

8

accommodation];[10] Cal. Code Regs., tit. 2, § 11069, subd. (d)(2) ["If reassignment to an alternate position is considered as an accommodation, the employee shall provide the employer or other covered entity information about his or her educational qualifications and work experience that may help the employer or other covered entity find a suitable alternative position for which the employee is qualified and for which the employee can perform the essential functions."].)  Cases often use the words "able" and "qualified" interchangeably to express this notion.  (See, e.g., *Green v. State, supra,* 42 Cal.4th at p. 260 [a plaintiff has the burden under the FEHA "to show that he or she is a qualified individual," "i.e., that he or she can perform the essential functions of the job with or without reasonable accommodation"]; *Scotch, supra,* 173 Cal.App.4th at p. 1006 [the plaintiff failed to present evidence he was otherwise qualified for the job, i.e., had a master's degree]; *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 963, 972, 977; *Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 971-972.)

Like these cases, CACI Nos. 2540 and 2541 use "able" to convey that a plaintiff must prove he was "able" to perform the job in the physical sense *and* in the sense he had the necessary credentials or training to do the job.  The jury here would not have understood otherwise and would not have construed those instructions narrowly, imposing on Williams only the burden of proving his physical ability to do a job.  Rather, although the MTA asserts that Williams's evidence "focused solely on the ability half of the qualification-ability two-part equation," the evidence as a whole was not so narrowly focused.  Williams, for example, testified about his education, pre- and post-MTA work history (including performing light duty such as clerical work, "inputting data," and "checking the computer" at the MTA), and that he completed the MTA's presupervisory course.  Matias agreed that when she and Williams met, they reviewed his qualifications and job history.  Exhibit 39, which reflected those credentials, was in evidence.  She also

---

**10**     In interpreting the FEHA, we can look to its federal counterpart, the Americans with Disabilities Act (ADA).  (*Green v. State of California* (2007) 42 Cal.4th 254, 260.)

told Williams that he had to meet the minimum requirements for any position he was interested in.

Williams then attempted to demonstrate his qualifications for various positions at the MTA. He introduced the MTA's job specifications for schedule checker, photocopying machine operator, customer information agent, customer service agent I, CCTV observer, general clerk III, custodian, and stock clerk. Matias testified about the qualifications necessary for some of those positions. According to her, Williams didn't meet the photocopying position's minimum requirements because he didn't have experience operating high speed machines and supervisory equipment, and his prior office experience didn't satisfy the minimum requirements. Williams was unqualified to be a stock clerk because he did not have "one-year experience performing stock warehousing or inventory control work in a computerized automated environment" and didn't have a forklift certification and license. Matias thought, however, that Williams was qualified for customer information agent and schedule maker positions.

From this evidence and the instructions given, it was clear Williams had the burden of proving he was able *and qualified* to perform positions at the MTA. Moreover, Williams's qualifications were so hotly contested that the jury could not have failed to understand they were an issue. We therefore discern no prejudice from the omission of the MTA's requested instruction.

C.      *Instructional error regarding the burden of proof.*

The MTA requested the jury be instructed as follows: "The availability of a reasonable accommodation is necessary to a claim for reasonable accommodation. The burden of proving the availability of a reasonable accommodation rests on the employee." The trial court denied the request, finding the first sentence to be a "tautology" and that other instructions covered the burden of proof. The MTA, however, contends that the instruction was necessary because "nowhere in any other instruction does it say that plaintiff had the burden of establishing the existence of a reasonable accommodation," i.e., that a vacant and available position existed.

10

A plaintiff claiming disability discrimination and a failure to provide reasonable accommodation must prove "ability, with or without accommodation, to perform the essential functions of an available vacant position that would not be a promotion." (*Nadaf-Rahrov v. Neiman Marcus Group, Inc., supra,* 166 Cal.App.4th at p. 963.) To the extent the MTA wanted the jury accordingly instructed that Williams had to prove there was a vacant and available position, the first sentence of the MTA's proposed instruction failed to clearly and unambiguously convey that concept. If not a tautology, then that first sentence was, at a minimum, confusing. The court therefore did not err by refusing the instruction on that ground alone. (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 684-685 [court may refuse to give a proposed instruction that is misleading or incomprehensible to the average juror, and court has no duty to modify a proposed instruction]; *Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 475.)

In any event, there was no prejudice to the MTA because there was evidence of vacant, available positions. (See section III, *post*.)

D.      *Instructional error regarding the length of the interactive process.*

The jury was given plaintiff's special instruction No. 3: "It is unlawful for an employer to fail to engage in a timely, good faith, interactive process to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodations by an employee with a known physical disability. [¶] 'Interactive process' means timely, good faith communication between the employer and the applicant or employee to explore whether or not the applicant or employee needs reasonable accommodation for the applicant's or employee's disability to perform the essential functions of the job, and, if so, how the person can be reasonably accommodated. *There is no limit as to how long the interactive process is to last.*" (Italics added.) The MTA now objects to that last sentence, contending it compelled a verdict in plaintiff's favor, because the undisputed evidence was that the MTA places a six month limit on the interactive process.

11

Special instruction No. 3, however, was not an inaccurate statement of the law. Once the interactive process is initiated, the employer's obligation to engage in the process in good faith is "continuous" (*Scotch, supra,* 173 Cal.App.4th at p. 1013; accord, *Swanson v. Morongo Unified School Dist.* (2014) 232 Cal.App.4th 954, 971) and will not be exhausted in one effort (*Humphrey v. Memorial Hospitals Ass'n* (9th Cir. 2001) 239 F.3d 1128, 1138). Both parties are obliged to keep communication open and to undertake reasonable, good faith efforts to communicate concerns and information. (*Scotch,* at p. 1013; *Humphrey*, at p. 1138.) Thus, Williams and the MTA agree that the interactive process is just that: a process. There is, in the MTA's words, "no *one* interactive process that applies to all," and the FEHA sets no "high or low limit in terms of what might be considered timely or reasonable."

This is exactly what special instruction No. 3 states: there is "no limit" to the process. The MTA, however, now complains that the instruction was problematic because the undisputed evidence was the MTA places a six month limit on the interactive process. That is an evidentiary issue, not an instructional one. The instruction certainly calls into question the MTA's policy, but the MTA's policy does not call the instruction into question.

Rather, because the instruction was not an inaccurate statement of the law, it was the MTA's burden to object to it or to otherwise propose a modification. " 'Where, as here, "the court gives an instruction correct in law, but the party complains that it is too general, lacks clarity, or is incomplete, he must request the *additional or qualifying instruction in order to have the error reviewed*." [Citations.]' [Citation.] [A party's] failure to request any different instructions means he may not argue on appeal the trial court should have instructed differently." (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1131.) The MTA did not clearly and specifically object to the instruction's last sentence. When the court asked if there was an objection to special instruction No. 3, the MTA's counsel said, "CACI 2546 [regarding failure to engage in the interactive process] does describe interactive process, but not with the same details as

12

[special instruction No. 3]." The court said it would "look at it. It could just be the elements." After more discussion about CACI No. 2546, the court said, "All right. So it looks to me like 3 is okay." The MTA's counsel said nothing further. Trial counsel thus never argued that the last sentence was incorrect or misleading and requested no modification. This issue is therefore forfeited.

The MTA, however, argues that even if the instruction was technically correct, plaintiff's counsel, in closing, invited the jury to interpret the last sentence incorrectly, i.e., that the interactive process was limitless. Plaintiff's counsel said in closing: "I want you to focus on this last sentence of this instruction. This is a very important instruction. [¶] There is no limit as to how long the interactive process is to last. The law doesn't say there's six months. The law doesn't say it's two months. The law doesn't say it's a year. There is no limit. You have to go through the process until you can find a position, especially when you're an organization as large as the MTA and have as many positions as the MTA. [¶] So limiting yourself, arbitrarily choosing a time period, violates the law. The arbitrary six-month time period that the MTA has set out in this case violates the law. There is no time limit." He also said, "They testified six months, that's it. . . . [¶] We read the obligations of the law. The interactive process has no ending. It's a continuing obligation. That is the law. You didn't hear [the] MTA talk about the law."[11] The gist of counsel's statements was that the MTA's six month, one size fits all, policy violated the FEHA. This was a fair comment. To the extent counsel's comments could be interpreted to mean that the interactive process ends *only* when the plaintiff gets a position, that would be an incorrect statement of the law. Any such suggestion, however, was an isolated one and the jury was instructed that if "the attorneys have said anything different about what the law means, you must follow what [the court says]" (CACI No. 5000).

---

[11] The MTA did not object to counsel's comments.

13

Finally, even if we assumed arguendo that the instruction's last sentence was inaccurate, the MTA does not explain how any error infected *all* causes of action so as to warrant a reversal of the judgment. (*Soule, supra,* 8 Cal.4th at pp. 573-580.) Rather, the case went to the jury on three theories of liability: (1) failure to participate in the interactive process, (2) failure to provide reasonable accommodation, and (3) disability discrimination/disparate treatment.[12] The jury found for Williams on *all* three theories of liability. Even if the jury had found against Williams on the first theory to which the instruction directly applied—failure to participate in the interactive process—he won on the second and third. Williams didn't get separate damages for each cause of action; the same damages applied to each cause of action, and the jury was so instructed (CACI No. 3934). Also, nothing in the instruction precluded the MTA from showing that the interactive process it engaged in with Williams during the six-month period complied with the FEHA. Any error in giving special instruction No. 3 therefore was not prejudicial.

E.    *Special instruction re union contracts.*

Although the trial court engaged the parties in extensive and detailed discussions about jury instructions before trial,[13] the MTA "surprised" the court and plaintiff's counsel by asking, during trial, that the jury be instructed it is "not reasonable to violate someone else's rights under their union contracts to accommodate a plaintiff." The court denied the request, because the MTA failed to provide "clear California law," and there was no evidence of what the "collective bargaining agreement says. All I have is people's understanding. I have nothing in evidence about what the actual collective bargaining agreement for any of the unions says." The court did not err by refusing the instruction, because it was already covered by special instruction No. 9.

---

[12]    The fourth theory, retaliation, is not at issue.

[13]    It is counsel's duty to file and serve proposed jury instructions before the first witness is sworn. (Code Civ. Proc., § 607a.)

Special instruction No. 9 provided, in accordance with California Code of Regulations, title 2, section 11068, subdivision (d): "The employee with a disability is entitled to preferential consideration of reassignment to a vacant position over other applicants and existing employees. *However*, ordinarily, an employer is not required to accommodate an employee by ignoring its bona fide seniority system, absent a showing that special circumstances warrant a finding that the requested 'accommodation' is 'reasonable' on the particular facts, such as where the employer reserves the right to modify its seniority system or the established employer practice is to allow variations to its seniority system." (Italics added; see also *U.S. Airways, Inc. v. Barnett* (2002) 535 U.S. 391, 403 [an accommodation that conflicts with the rules of a seniority system "will ordinarily be unreasonable"].) It is therefore unclear what the MTA's proposed instruction added to special instruction No. 9. (*Red Mountain, LLC v. Fallbrook Public Utility Dist., supra,* 143 Cal.App.4th at pp. 359-360.)

Moreover, although Matias generally testified that letting Williams apply for an "internally" posted position would violate that union's seniority system, she conceded that each union had its own seniority rules. As the trial court pointed out, the union contracts were not offered into evidence. Therefore, there was no evidence about any unions' seniority rules.

## III. Sufficiency of the evidence.

The MTA next contends that the verdict must be reversed because Williams failed to prove there existed a vacant and available position for which he was qualified and that there was a " 'special circumstance' that would have rendered a violation of MTA's union contracts 'reasonable.' " We disagree.

The MTA's argument essentially rests on a request we reweigh evidence and resolve evidentiary conflicts, something we may not do under the substantial evidence standard of review. (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1203-1204.) Instead, we view the evidence in the light most favorable to Williams and give that evidence the benefit of every reasonable

inference. (*Ibid.*; see also *McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 389 [actions for unlawful discrimination and retaliation are inherently fact-driven, and we recognize that it is the jury, and not the appellate court, that is charged with the obligation of determining the facts]; *Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1218-1219.)

Under that standard of review, we reject the MTA's assertion that Williams "did not even attempt to introduce" evidence he was qualified for any open position. As to his qualifications, Williams testified about his educational and work history, which included managing an office, photocopying, and using a computer. The evidence notably included Williams's testimony that, after he was injured, the MTA assigned him to 60 days of "light duty" doing office work, which suggests that the MTA considered Williams qualified for such work. Matias also confirmed that she knew Williams's qualifications because she reviewed them with Williams in their face-to-face meeting at the beginning of the interactive process. Also relevant to Williams's qualifications was Matias's concession that retraining is a form of reasonable accommodation. But she never offered to retrain Williams for any position, because "the training part comes with the reassignment of the – if he was reassigned to a different position, then he gets the training in that position." The jury could have believed that this circular answer amounted to a statement that the MTA would not reassign Williams to another position.

Nor do we agree that the only evidence before the jury was that Williams was unqualified for any open position at the MTA. On the interactive checklist form Matias filled out, she conceded that Williams may qualify for a customer information agent,[14] clerical, and administrative positions—all positions in which Williams expressed interest. Williams was also interested in a schedule checker position, which would require him to ride buses and collect surveillance data by inputting it into a handheld device. Matias considered him unqualified for the schedule checker position based solely on her

---

[14] A customer information agent receives calls and provides bus schedule information.

characterization of it as a "field" job, not an "office" job. Matias, however, never contacted Dr. Capen to verify whether Williams could perform the job. The jury therefore could have found that Williams was qualified for the position and that the position fit within a reasonable, as opposed to unreasonable, interpretation of the parameters of Dr. Capen's work restrictions. In other words, the jury could have discounted Matias's explanation as sophistry and lacking good faith. (See *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67-68 ["It is well settled that the trier of fact may accept part of the testimony of a witness and reject another part even though the latter contradicts the part accepted" and " 'the jury properly may reject part of the testimony of a witness, though not directly contradicted, and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material' "].)

The jury could have also rejected the MTA's evidence that there were no open positions available to Williams. On direct examination by plaintiff's counsel, for example, Matias was unaware that the MTA filled 16 customer information agent positions between September and November 2009, which was during Williams's interactive process. She couldn't explain why Williams was not offered any of those positions: "I don't have any explanation." On cross-examination, however, she explained that a "qualified candidate pool" had been established and any openings that occurred would be filled from that pool. Even though the jury could have completely disregarded this explanation, it was, in any event, unclear, why the establishment of a candidate pool precluded Williams from being considered for an open position. Indeed, there was an open "external" customer information agent position in August 2010, when Williams was still at the MTA, but he wasn't considered for that opening either.

There was also an open external service attendant position in February 2010. A service attendant cleans buses. Matias did not consider Williams for that job because she thought his work restrictions precluded him from doing it, and she didn't give Williams an opportunity to apply for it.

17

Matias agreed that Williams was qualified to be a schedule maker, who gathers transit surveillance data and designs routes. In April 2011, there was an open external schedule maker position, which was within Williams's union. Matias's explanation for why this position was unavailable to Williams was "[i]t was open a year after I closed the interactive process." Notwithstanding that this position became open after the six-month window the MTA allowed for Williams's interactive process, the jury reasonably could have found that Williams should have been considered for the position.

Given this evidence of open positions, we disagree that Williams had to show that the MTA should have considered him for an internal position in a different union. The jury never had to reach that issue to find for plaintiff. But, on that issue, although Matias conceded that employees may transfer from union to union, she never made any effort to see if, as a form of reasonable accommodation, Williams could transfer to another union so that he could fill a position in that union "because it's contractual."

## IV. The MTA's motion in limine to exclude e-mails.

The MTA moved in limine to preclude Williams from offering evidence of an e-mail exchange between Anderson, the MTA's return to work coordinator, and Curley Little, the MTA's Division 18 operations manager. Anderson wrote, " 'In my opinion, I don't think we'll prevail with a medical separation because he will bring in a current report from Dr. Capen to say he is TTD.' " Little responded, " 'Will we get sued for wrongful termination?' " The court refused to exclude the e-mails, finding "it's not a legal opinion." We cannot conclude that the trial court abused its discretion by admitting the e-mails. (*Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1111 [evidentiary rulings are reviewed for abuse of discretion].)

The MTA argues that the e-mails were inadmissible as a lay witness's improper legal opinion, i.e., that the MTA wrongfully terminated Williams. (Evid. Code, § 800; see generally *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1120 [plaintiff's statements he was " '*harassed and subjected to a hostile work environment*' " were inadmissible opinion and conclusion]; *Pond v. Insurance Co. of North America* (1984)

18

151 Cal.App.3d 280, 289 [claims adjusters' opinions as to coverage excluded].) The e-mails, however, did not state a legal conclusion that the MTA wrongfully terminated Williams. Rather, they asked, *did* we do something wrong? Anderson and Little were closely involved in the decision to fire Williams, and they had an understanding of what wrongful termination means; hence, the e-mails raised a valid inference that there was an awareness or belief that there was a problem with the MTA's process. In fact, the e-mails could fairly be read to imply that Anderson and Little were attempting to ensure compliance with the law, an interpretation favorable to the MTA.

## DISPOSITION

The judgment is affirmed. Plaintiff and respondent Robert Williams shall recover his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

EDMON, P.J.

HOGUE, J.*

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.