Filed 10/26/21; Certified for Publication 11/18/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KIMBERLY WILKIN,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>COMMUNITY HOSPITAL OF THE MONTEREY PENINSULA et al.,<br><br>    Defendants and Respondents. | G060420<br><br>(Super. Ct. No. 18CV001139)<br><br>O P I N I O N |

\*            \*            \*

Appeal from a judgment of the Superior Court of Monterey County, Susan J. Matcham, Judge.  Affirmed.

Ladva Law Firm, Ashwin V. Ladva and Scott S. Nakama for Plaintiff and Appellant.

Fenton & Keller and Christopher E. Panetta for Defendants and Respondents.

\*            \*            \*

## INTRODUCTION

The Community Hospital of the Monterey Peninsula (the Hospital) terminated the employment of registered nurse Kimberly Wilkin (Wilkin) after discovering she had violated the Hospital's policies governing the handling and documentation of patient medications. Wilkin sued the Hospital, alleging her discharge constituted disability discrimination, retaliation, and otherwise violated the Fair Employment and Housing Act (FEHA), Government Code section 12900 et seq.;[1] resulted in the unlawful denial of medical leave and retaliation in violation of the Moore-Brown-Roberti Family Rights Act (CFRA), sections 12945.1 and 12945.2, and the federal Family and Medical Leave Act of 1993 (FMLA), title 29 United States Code section 2601 et seq.; and constituted a wrongful termination in violation of public policy.

Over a year after Wilkin filed her complaint, the Hospital filed a motion for summary judgment. The Hospital produced undisputed evidence, including Wilkin's deposition testimony, showing she had violated policies governing the handling of medication, and, for over a year before she was discharged, had been regularly counseled for her chronic absenteeism and other issues. The trial court concluded the Hospital carried its burden of producing evidence showing its decision was based on legitimate, nondiscriminatory reasons. After Wilkin did not produce any evidence showing the Hospital's reasons were fabricated or otherwise pretextual, the trial court concluded a reasonable trier of fact could not find in favor of Wilkin on any of her claims and granted summary judgment in favor of the Hospital.

We affirm. We have independently reviewed the record, including the evidence proffered by the parties, and agree with the trial court that it is devoid of evidence of pretext. As all of Wilkin's claims depended on there being a triable issue of

---

[1] All further statutory references are to the Government Code unless otherwise specified.

fact regarding the lawfulness of her discharge, and our record does not show such a triable issue of fact exists, summary judgment was properly granted.

## UNDISPUTED MATERIAL FACTS

Wilkin's employment with the Hospital began in 2005. Throughout her employment, she worked as a registered nurse in the Hospital's Main Pavilion Department where she was responsible for delivering direct nursing care to patients. Her duties included assessing the needs of patients, making appropriate referrals for patients identified at risk, performing pain assessment at intervals appropriate for specific needs of patients, evaluating patients' responses to treatment, creating timely and accurate documentation, and adhering to the Hospital's medication policies, practices, and standards. Throughout her employment, she was supervised by department assistant director, Julie Clement, and department director, Diana Poudrier.

### I.

#### WILKIN'S HISTORY OF POOR ATTENDANCE

#### November 2016

In November 2016, Wilkin received a written disciplinary notice for poor attendance. Before receiving that notice, the Hospital provided Wilkin with three courtesy notifications warning her that she could be disciplined if her attendance did not improve. The November 2016 notice specifically warned Wilkin her employment could be terminated if her attendance continued to be poor.

#### December 2016-February 2017

Wilkin's attendance continued to be poor. In December 2016, Wilkin received another written disciplinary notice for poor attendance warning her that she could be discharged if her attendance did not improve. Again, in February 2017, Wilkin received a written disciplinary warning for poor attendance. That month, Wilkin attended

3

a meeting with Poudrier and Jeri Gilbert, the Hospital's assistant director of human resources, to discuss her ongoing attendance problems and communication issues that had been raised by other employees.

### March 2017-May 2017

In March 2017, Wilkin requested intermittent family leave under FMLA and was granted time off approximately one to two times per month. In response to discovery responses, Wilkin stated she "suffered from multiple disabilities including chronic back pain, Hashimoto's disease, torn wrist ligaments, whiplash and uterine issues which included excessive cramping and bleeding." The record is unclear which of these health issues triggered the need for intermittent leave.[2]

In April 2017, Wilkin was suspended after Poudrier discovered she had failed to renew her nursing license. Wilkin was provided a written notice that, upon her return to work, she would be issued a disciplinary probation.

On May 10, 2017, Poudrier, Gilbert, and the Hospital's leave specialist Carol Eason sent Wilkin a letter regarding her failure to renew her nursing license and her poor communication regarding her recent absences. That letter stated in part: "This letter serves as follow-up to a 5/2/17 email message and 5/8/17 voice mail left by Carol Ann Eason, Leave Specialist regarding your recent absences. Because you have not been

---

[2] The record does not contain evidence or analysis establishing Wilkin has a disability within the meaning of FEHA. At the hearing on the motion for summary judgment, the trial court sought to clarify the ambiguity in the record regarding the nature of Wilkin's disability:
"The Court: First of all, when did your client tell them that she had a disability?
"[Wilkin's counsel]: She's been telling them of ongoing different disabilities.
"The Court: That's what I don't understand. What do you mean by 'ongoing different disabilities'?
"[Wilkin's counsel]: She had a sprained back, which was a dispute, because she couldn't perform.
"The Court: Did she ask for accommodation?
"[Wilkin's counsel]: She asked for FMLA intermittent leave."

4

responsive to those messages, it is necessary to send this letter documenting our attempts to reach you and to remind you of your obligation to appropriately communicate and follow policies and processes for leaves of absence. [¶] There has been confusion regarding your sick calls. You have frequently called in sick, but have not indicated whether your absences were for your IFMLA covered serious health condition. Additionally, your absences have exceeded the estimated frequency of your need for the FMLA protected intermittent leave (1-2 times per 2 months with 2-3 days per episode) according to your healthcare provider. If your health circumstances have changed and the current IFMLA certification on file is no longer accurate, an update is needed (forms attached). Also, please clarify which absences were IFMLA related. [¶] You last worked on 4/27/17 and have been off sick since that time. At this time, it is necessary for you to provide documentation from your healthcare provider for your continuous medical leave (4/28-current). A release to return to work is also required. Completed signed forms are due on 5/17/17-(15 days from when we first reached out to you on 5/2/17)." (Boldface omitted.)

Later that month, Wilkin was approved to increase her intermittent FMLA leave to two to three days a month.

**August 2017-September 2017**

Wilkin informed her supervisor that she had been the victim of a violent crime on August 4, 2017, resulting in the need for her to take a medical leave of absence as a result of the assault. Wilkin was out from work from August 4, 2017 to September 10, 2017. She was not penalized for taking that leave.

By the end September 2017, Wilkin's attendance continued to be poor; she had accumulated enough negative attendance points on the Hospital's Kronos timekeeping system for it to automatically "advance her discipline to termination review status." There is no suggestion in the record that Wilkin's attendance issues had anything to do with her taking FMLA leave or any of her health conditions. On September 27,

5

Wilkin met with Poudrier and the Hospital's chief human resources officer, Greg Smorzewski, to discuss Wilkin's ongoing attendance issues. Although Wilkin's attendance issues were severe enough for her to be discharged under the Hospital's attendance policy, Poudrier and Smorzewski decided not to terminate Wilkin's employment but to instead offer her another chance to improve her attendance. They warned Wilkin that if she had any more "missed punches" in the Hospital's Kronos timekeeping system at the beginning or end of a shift or for lunch, or if she had any unscheduled absences, her employment could be terminated under the Hospital's attendance policy.

### November 2017-December 2017

Still, Wilkin's attendance record continued to be poor. In November 2017, Poudrier gave Wilkin a written disciplinary notice for her ongoing attendance issues informing her that she was suspended for one week while the Hospital reviewed and investigated the matter. After the Hospital reviewed Wilkin's attendance record, and in particular the approved leave she took in August 2017, the Hospital rescinded the suspension and Wilkin was permitted to return to work. But Wilkin violated the Hospital's attendance policy again in December 2017, triggering a potential suspension and placing her on employment termination review status.

### II.

### DISCREPANCIES IN WILKIN'S MEDICATION DOCUMENTATION, INCLUDING FOR CONTROLLED SUBSTANCES

In an effort to comply with controlled substance laws and regulations, and to ensure the health and safety of its patients, the Hospital maintained various policies governing how employees handle, document, and administer controlled substances, and how supervisors monitor employees' contacts with controlled substances, investigate issues, and report discrepancies discovered by the Hospital. These policies were in place during Wilkin's employment.

6

In November 2017, Poudrier was asked to investigate a concern that a patient had received a medication without supporting documentation. Using the Hospital's internal record system, Poudrier reviewed Wilkin's documentation and found that Wilkin had cared for the patient and had failed to properly document her handling and administration of Narcan to that patient. During the course of her investigation, Poudrier found other occasions in which Wilkin signed off on the administration of medication, including controlled substances, but failed to properly complete documentation related to such administration.

On November 14, 2017, Poudrier e-mailed Smorzewski a summary of the issues and concerns she had regarding Wilkin's controlled substance documentation. The investigation continued, and the Hospital learned the following over time.

On July 10, 2017, Wilkin pulled a four-milligram syringe of morphine from the Hospital's medication dispensing machine to fill an order to administer one to two milligrams. Wilkin documented that she gave the patient two milligrams of morphine, but she failed to document what happened to the remaining two milligrams as required by Hospital policy.[3]

On September 23, 2017, Wilkin documented that a patient had received four milligrams of morphine from a 10-milligram morphine syringe, but she did not complete corresponding documentation accounting for the disposal of the remaining six milligrams of morphine. Wilkin admitted that she should have documented what happened to the remaining six milligrams of morphine. Also on September 23, 2017, Wilkin pulled two milligrams of Lorazepam and gave one milligram to a patient; she failed to document whether and how she disposed of the remaining milligram.

On November 23, 2017, Wilkin used a system override function to pull a 10-milligram syringe of morphine without a written order from a prescribing physician.

---

[3] There is no contention by the Hospital and no evidence in the record suggesting Wilkin did anything untoward with the unaccounted-for medication.

She then documented that she had given the medication to the patient approximately 42 minutes before the time she had pulled the medication from the medication dispensing machine.

On December 7, 2017, Wilkin used the system override function to pull two milligrams of morphine, but she failed to document how much, if any, of the morphine was given to the patient and how much, if any, was discarded. On December 17, 2017, Wilkin pulled one milligram of Lorazepam in two .5 milligram installments without documenting whether she gave any of this drug to a patient or how much, if any, she discarded. Wilkin did not deny these events occurred.

On December 21, 2017, Wilkin pulled a 10-milligram syringe of morphine from the medication dispensing machine and electronically confirmed that she gave the patient eight milligrams and discarded the remaining two milligrams. Her written medication administration record, however, stated the patient only received four milligrams of morphine. This discrepancy left four milligrams of morphine unaccounted for; Wilkin admitted at her deposition that such a discrepancy should have been documented. Also on December 21, 2017, in an unrelated incident, Wilkin pulled a 10-milligram syringe of morphine and electronically confirmed she gave a patient four milligrams and discarded the remaining six milligrams. In her medication administration record, however, Wilkin indicated that she only gave the patient two milligrams, leaving two milligrams of morphine unaccounted for. Again, at her deposition, Wilkin admitted this discrepancy should have been documented.

Finally, on December 22, 2017, Wilkin pulled a 10-milligram morphine syringe from the medication dispensing machine and electronically confirmed that she gave a patient four milligrams and discarded the remaining six milligrams. Wilkin, however, indicated in her medication administration record that the patient received only two milligrams of morphine, again leaving two milligrams of morphine unaccounted for; Wilkin admitted at her deposition that such a discrepancy should have been documented.

8

Wilkin testified in her deposition that she occasionally disposed of unused drugs (also referred to as "wasting") by herself, notwithstanding the Hospital's policy requiring a witness to be present when unused drugs are wasted. She also testified "[t]here may have been times I forgot to document drugs. All kinds of drugs. Not just narcotics."

## III.

### FOLLOWING FURTHER COMMUNICATIONS AND MEETINGS, WILKIN'S EMPLOYMENT IS TERMINATED IN JANUARY 2018

Poudrier decided to terminate Wilkin's employment in late December 2017 on the grounds Wilkin had repeatedly failed to accurately document her handling and administration of controlled substances and because of her ongoing chronic attendance issues. On January 5, 2018, Poudrier called Wilkin and told her that she needed to attend an employment termination meeting with human resources on January 8, 2018. During that telephone conversation, Wilkin told Poudrier that she was requesting a reasonable accommodation in the form of a medical leave of absence. Because Wilkin requested a reasonable accommodation, Poudrier and others determined that Wilkin would not be immediately discharged. Instead, it was decided Wilkin would be suspended for one week following the scheduled January 8 meeting for the stated purpose of meeting with Wilkin, considering her request, and conducting a further review and investigation of the controlled substance documentation issues.

Wilkin testified that at the meeting, she was asked to explain some of the undocumented medications. Wilkin thereafter sent an e-mail to Poudrier in which she stated, "I will be much more diligent about my charting and waste and work with the physicians to get orders in immediately, as I know patient safety is the priority, if given the opportunity."

Poudrier ultimately decided to terminate Wilkin's employment based on her controlled substance documentation discrepancies and her chronic attendance issues.

9

Poudrier concluded that, like her controlled substance documentation issues, Wilkin's failure to improve her persistent attendance issues jeopardized patient safety and ultimately formed an additional legitimate, nondiscriminatory reason for her discharge.

On January 16, 2018, Poudrier attended another meeting with Wilkin and Gilbert. At the meeting, Poudrier provided Wilkin with a written notice that she was being discharged because of her drug documentation violations and attendance issues.

Based on Poudrier's investigation findings, on January 16, 2018, the Hospital filed a complaint with the Board of Registered Nursing to notify the Board of the issues surrounding the documentation of Wilkin's handling and administration of controlled substances.

At her deposition, Wilkin testified that at least two other employees in her department previously had been discharged because of drug diversion or issues involving medication.

## PROCEDURAL HISTORY

### I.

### THE COMPLAINT

Wilkin filed a complaint against the Hospital[4] alleging (1) disability discrimination (§ 12940, subd. (a)); (2) retaliation (§ 12940, subd. (h)); (3) failure to maintain an environment free from discrimination; (4) failure to offer reasonable accommodation (§ 12940, subds. (m), (n)); (5) failure to engage in interactive process (§ 12940, subd. (n)); (6) violation of CFRA (§ 12945) and FMLA; (7) retaliation in

---

[4] Poudrier was also named as a defendant in the complaint. Wilkin alleged a claim for intentional infliction of emotional distress against the Hospital and Poudrier, and a defamation claim against Poudrier only. The trial court's order granting summary judgment resolved those two claims in favor of both defendants. In her opening brief, Wilkin states she does not challenge the trial court's ruling as to either of those claims on appeal. We therefore do not address those claims further in this opinion.

10

violation of CFRA; (8) wrongful termination in violation of public policy (violation of FEHA, CFRA, and FMLA and/or the California Constitution); and (9) retaliation for using accrued sick leave in violation of Labor Code sections 233 and 234, and section 246.5 of the Healthy Workplaces, Healthy Family Act of 2014 (Lab. Code, § 245 et seq.).

## II.

### THE MOTION FOR SUMMARY JUDGMENT

The Hospital filed a motion for summary judgment or, in the alternative, for summary adjudication of issues on the ground each of Wilkin's claims failed as a matter of law. The Hospital argued that the claims for disability discrimination, retaliation in violation of FEHA, violation of the CFRA, retaliation in violation of the CFRA, wrongful termination in violation of public policy, and retaliation for using accrued sick leave each failed because Wilkin was "discharged for legitimate, nondiscriminatory reasons and there [was] no evidence of pretext."

The Hospital also argued the failure to prevent discrimination claim failed because Wilkin was never subjected to discrimination during her employment at the Hospital. The Hospital further argued the failure to reasonably accommodate a disability claim and the claim for failure to engage in the interactive process each failed because Wilkin "had already engaged in the misconduct that formed the basis of her legitimate, nondiscriminatory discharge before she requested a reasonable accommodation on the eve of her termination meeting."

In support of the motion, the Hospital produced, inter alia, excerpts from Wilkin's deposition testimony and from her responses to discovery requests; Poudrier's and Smorzewski's declarations; copies of the Hospital's policies regarding attendance and the handling and monitoring of controlled substances; the Hospital's records showing discrepancies in Wilkin's controlled substance documentation; Poudrier's performance notes for Wilkin; Wilkin's written disciplinary notices; Poudrier's November 14, 2017 e-mail to Smorzewski regarding concerns about Wilkin's documentation issues; and

11

Wilkin's January 9, 2018 e-mail to Poudrier stating that if given the chance, she would be more diligent about documentation issues.

Wilkin filed written opposition to the motion in support of which she submitted excerpts from her own deposition as well as from the depositions of Poudrier, Clement, Gilbert, Main Pavilion Assistant Director Susan McCall, Dr. Mikko Helenius, and pharmacist Theresa Beauclair. Wilkin does not contend she was unable to complete discovery before opposing the motion for summary judgment and did not seek a continuance of the hearing on the motion.

## III.

### THE TRIAL COURT GRANTS THE MOTION FOR SUMMARY JUDGMENT

At the hearing on the motion, the trial court repeatedly asked Wilkin's counsel to show the court where in the record there was evidence that the Hospital's reasons for terminating Wilkin's employment were fabricated or pretextual. The trial court granted the motion for summary judgment and explained: "It is plaintiff's burden to provide substantial evidence that the stated reasons for the adverse action were untrue or were pretextual. Beyond that here, I don't believe the plaintiff has met that burden. But I also do not believe that plaintiff has provided evidence that the hospital acted with a discriminatory animus that a reasonable trier of fact could conclude was intentional discrimination.

"With respect to the retaliation claims which are connected to the discrimination claims, I think plaintiff has again failed to offer evidence that the stated reasons for her termination were untrue or pretextual, or that the hospital had a retaliatory intent.

"Then with respect to the cause of action on failure to maintain an environment free from discrimination, I'll find that that also fails.

"With respect to the reasonable accommodations, plaintiff did not request accommodations until . . . January 4th, 2018, in advance of the termination meeting,

12

which was a few days later.  And I do think that the—I think it's the *Alamillo*[ *v. BNSF Ry. Co.* (9th Cir. 2017) 869 F.3d 916] case applies here with respect to that.  That the employer is not required to rescind their decision with regard to termination because the plaintiff has at that point requested accommodations."

The trial court also ruled on all of the parties' evidentiary objections; neither party challenges any of the trial court's evidentiary rulings on appeal.  The trial court later signed a 12-page order granting the motion for summary judgment.  Wilkin filed a notice of appeal.

## APPEALABILITY

Although Wilkin's notice of appeal states Wilkin appeals from the judgment entered after the trial court granted defendants' motion for summary judgment, our record, including the register of actions contained in the clerk's transcript, does not reflect that a judgment was entered following the trial court's order.

The final paragraph on page 11 of the trial court's signed 12-page order granting summary judgment in this case states:  "THEREFORE, IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment, or in the alternative, for Summary Adjudication of Issues is hereby GRANTED, and that Defendants are hereby dismissed from the action with prejudice.  The parties will jointly submit a proposed form of judgment (or, if they cannot agree, separate proposed forms of judgment) within 5 court days of this Order."  The parties did not thereafter submit a joint proposed judgment or separate proposed judgments.  In the Clerk's Transcript, the document following the trial court's signed order is a "notice of entry of judgment" form which solely refers to and attaches a copy of the signed order.

No party has raised appealability as an issue, but instead all have construed the trial court's signed order as an appealable judgment.

13

An order granting summary judgment is not an appealable order.  (*Levy v. Skywalker Sound* (2003) 108 Cal.App.4th 753, 761-762, fn. 7.)  An appeal must be taken from a judgment entered based on an order granting summary judgment.  (*Ibid.*)  As discussed *ante*, no judgment appears in our record.  The Hospital, however, has not moved to dismiss this appeal and, as discussed *ante*, has construed the order granting summary judgment as an appealable judgment.

In the interests of justice and to avoid delay, particularly considering the impacts the COVID-19 pandemic has had on court operations, we exercise our discretion and construe the order granting summary judgment as incorporating an appealable judgment, and the notice of appeal as appealing from such judgment.


## DISCUSSION

### I.

### STANDARD OF REVIEW AND THE BURDEN-SHIFTING STANDARD OF DISCRIMINATION CLAIMS

"'On review of an order granting or denying summary judgment, we examine the facts presented to the trial court and determine their effect as a matter of law.'  [Citation.]  We review the entire record, 'considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained.'  [Citation.]  Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion.  [Citation.]  [¶] Summary judgment is appropriate only 'where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.'  [Citation.]  A defendant seeking summary judgment must show that the plaintiff cannot establish at least one element of the cause of action."  (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents*).)

As another panel of this court has explained: "California uses the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination based on a theory of disparate treatment. (*Guz* [*v. Betchel National, Inc.* (2000)] 24 Cal.4th 317, 354 [(*Guz*)]; see *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*).) 'This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained.' [Citation.]

"Under the *McDonnell Douglas* test, the plaintiff has the initial burden of establishing a prima facie case of discrimination. [Citation.] To meet this burden, the plaintiff must, at a minimum, show the employer took actions from which, if unexplained, it can be inferred that it is more likely than not that such actions were based on a prohibited discriminatory criterion. [Citation.] A prima facie case generally means the plaintiff must provide evidence that (1) the plaintiff was a member of a protected class, (2) the plaintiff was qualified for the position he or she sought or was performing competently in the position held, (3) the plaintiff suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests a discriminatory motive. [Citation.]

"If the plaintiff establishes a prima facie case, then a presumption of discrimination arises, and the burden shifts to the employer to rebut the presumption by producing admissible evidence sufficient to raise a genuine issue of material fact the employer took its actions for a legitimate, nondiscriminatory reason. [Citation.] If the employer meets that burden, the presumption of discrimination disappears, and the plaintiff must challenge the employer's proffered reasons as pretexts for discrimination or offer other evidence of a discriminatory motive." (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1004 (*Scotch*).)

15

In *Scotch, supra*, 173 Cal.App.4th at pages 1004-1005, a panel of this court addressed the application of the *McDonnell Douglas* test in the context of a motion for summary judgment: "As *Guz* explains, several decisions suggest that when an employee opposes an employer's motion for summary judgment of a discrimination claim, the employer must make the initial showing of no merit and the *McDonnell Douglas* burdens are reversed. [Citation.] Other decisions suggest the plaintiff can survive the employer's summary judgment motion merely by presenting, at the outset, evidence satisfying the prima facie elements of *McDonnell Douglas*. [Citation.] *Guz* did not resolve the issue because the defendant in that case proceeded to the second step of the *McDonnell Douglas* test and produced admissible evidence sufficient to raise a genuine issue of material fact that its actions were taken for a legitimate, nondiscriminatory reason. [Citation.]

"In *Kelly* [*v. Stamps.com Inc.* (2005)] 135 Cal.App.4th 1088, the court explained the *Guz* standard in light of the California Supreme Court's decision in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826: 'A defendant employer's motion for summary judgment slightly modifies the order of these [*McDonnell Douglas*] showings. If, as here, the motion for summary judgment relies in whole or in part on a showing of nondiscriminatory reasons for the discharge, the employer satisfies its burden as moving party if it presents evidence of such nondiscriminatory reasons that would permit a trier of fact to find, more likely than not, that they were the basis for the termination. [Citations.] To defeat the motion, the employee then must adduce or point to evidence raising a triable issue, that would permit a trier of fact to find by a preponderance that intentional discrimination occurred. [Citations.] In determining whether these burdens were met, we must view the evidence in the light most favorable to plaintiff, as the nonmoving party, liberally construing her evidence while strictly scrutinizing defendant's.'" In *Scotch, supra*, 173 Cal.App.4th at page 1005, we agreed with and applied the standard set forth in *Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088,

in affirming summary judgment in favor of an employer as to a disability discrimination claim alleged under FEHA.

The Sixth Appellate District in *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 860-862 applied the same burden-shifting standard in the context of a motion for summary judgment as that applied in *Kelly v. Stamps.com Inc.* and *Scotch* and which we apply in the instant case. (See *Choochagi v. Barracuda Networks, Inc.* (2020) 60 Cal.App.5th 444, 457-458.)

## II.

### THE DISABILITY DISCRIMINATION CLAIM

In the first cause of action, Wilkin alleged disability discrimination in violation of section 12940, subdivision (a). FEHA declares it an "unlawful employment practice" to discharge a person from employment or discriminate against the person in the terms, conditions, or privileges of employment because of, inter alia, the person's disability. (§ 12940, subd. (a).) In the complaint, Wilkin alleged the Hospital engaged in disability discrimination by terminating her employment.

### A.

The Hospital Carried Its Initial Burden of Presenting Evidence of Nondiscriminatory Reasons for Terminating Wilkin's Employment.

In moving for summary judgment, the Hospital produced evidence that Wilkin's employment was terminated because she repeatedly failed to properly document the administration of patient medication and the discarding of unused medication in violation of the Hospital's policy and because of her chronic absenteeism over the course of the prior 14 months. Specifically, the Hospital produced evidence showing it began to investigate Wilkin's drug administration and documentation issues in November 2017 in response to a concern brought to Poudrier's attention that one of Wilkin's patients received a drug without supporting documentation. The investigation not only confirmed Wilkin failed to properly document that medication, but also led to the discovery that

17

Wilkin had failed to accurately document her administration and handling of drugs on several other occasions during the time period of July through December 2017.

At her deposition, Wilkin admitted that she had failed to comply with the Hospital's drug handling policy and acknowledged she had documented that she had administered a drug to a patient nearly an hour before she retrieved the drug from the medication dispensing machine. In response to questions about the discrepancies, Wilkin admitted there were issues with her charting and disposing of drugs and she told her supervisor that she needed to "'be much more diligent about [her] charting and waste . . . as [she] know[s] patient safety is the priority.'"

The Hospital also produced evidence of Wilkin's long history of attendance problems which included written disciplinary notices issued in November 2016, December 2016, and February 2017, meetings in September and November to discuss her ongoing attendance issues, and many warnings over the course of a year that if she failed to improve her attendance, her employment could be terminated.

The Hospital, therefore, satisfied its burden of presenting sufficient evidence of nondiscriminatory reasons for Wilkin's employment termination to enable a trier of fact to reasonably find, more likely than not, that they were the bases for the termination of her employment. The burden therefore shifted to Wilkin to "'adduce or point to evidence raising a triable issue, that would permit a trier of fact to find by a preponderance that intentional discrimination occurred.'" (*Scotch, supra*, 173 Cal.App.4th at p. 1005.)

## B.

### Wilkin Did Not Present Any Evidence of Pretext

Our review of the record shows Wilkin failed to present any evidence that the Hospital's stated reasons for terminating her employment were "'either false or

pretextual,[5] or evidence that the [Hospital] acted with discriminatory animus, or evidence of each which would permit a reasonable trier of fact to conclude the employer intentionally discriminated.'" (*Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 886.) It is undisputed Wilkin had attendance issues unrelated to any disability or health condition and that she violated the Hospital's policy regarding the documentation and handling of patient medication. Wilkin argues, however, that the evidence she produced in opposition to the motion for summary judgment raised triable issues of fact as to whether the Hospital's asserted reasons for its decision were pretext for discrimination.

First, Wilkin argues the record shows that she had complained that Kronos, the Hospital's timekeeping system, was unreliable in accurately keeping track of time clock punches, sometimes her absences were misclassified as unexcused because a coworker would fail to designate the absence as FMLA leave when Wilkin would call in to report an absence, and in November 2017 she was improperly placed on suspension due to a mistake in failing to credit her with leave for being a victim of crime in August and September 2017. The record shows, and Wilkin does not dispute, however, that the Hospital's mistakes in designating certain of Wilkin's absences as FMLA leave were corrected. Wilkin does not cite to a single absence that should have been designated FMLA leave but was not as of the time of her discharge. It is undisputed the Hospital never denied Wilkin any requested FMLA leave.

---

5 "'Many courts have used the term "pretext" in describing the employee's burden of persuading the court that the employer's proffered explanation is unworthy of belief. [Citations.] The United States Supreme Court has explained that "pretext" refers to "but for" causation. [Citation.] The employee need not show "he would have in any event been rejected or discharged solely on the basis of his [protected status], without regard to the alleged deficiencies . . . ." [Citation.] In other words, "[w]hile a complainant need not prove that [discriminatory] animus was the sole motivation behind the challenged action, he must prove by a preponderance of the evidence that there was a 'causal connection' between the employee's protected status and the adverse employment decision."'" (*Scotch, supra*, 173 Cal.App.4th at p. 1007.)

Furthermore, shortly after she was suspended due to a mistake in counting her crime victim leave against her, that mistake was corrected, and her suspension was rescinded. Wilkin's evidence, which we accept as true in our review, simply shows the Hospital made mistakes in timekeeping and those mistakes were corrected. Nothing suggests intentional fabrication. This evidence, therefore, in and of itself, does not show discriminatory animus or pretext. (See *Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 160 ["'The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent'"]; *Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 [honest, but mistaken belief that grounds for discharge exist precludes finding of discrimination].)

Second, Wilkin argued that an e-mail Poudrier sent to Smorzewski on October 27, 2017, contained evidence of pretext. That e-mail stated:

"See text below that Kim [Wilkin] just sent Julie [Clement]. We confirmed with the charge nurse that Kim said it was a sick leave. I believe Julie told Kim [¶] [t]hat she needs to notify her first before calling in if it was a FMLA day which she did not. [¶] Either way we go I am going to need to hire someone because she indicated she will not be returning for a while. Let's talk Monday on a plan.

"Hi Julie. I'm calling in fmla today. My md said there was no end date. If it stated so it was an error. However she is filling a new one out and will fax to carol today or by Monday. I'm trying to get in to see markensun today. I might be out for a while. Hope not let you know. [¶] Have A Wonderful Day."

At her deposition, Poudrier explained her reference to a "plan" in her e-mail was to ensure the department would be properly staffed by hiring a temporary "traveler" nurse to replace Wilkin while she was out on leave for an indefinite period.

Wilkin's contention that Poudrier's reference to forming a "plan" in her e-mail showed pretext is without merit. Wilkin does not challenge Poudrier's statements

20

that the e-mail was prompted by Wilkin having just informed the Hospital that she was then out on FMLA leave with "no end date" and that she "might be out for a while." Nothing in the subject e-mail reflects discriminatory animus or pretext for discrimination.

Third, Wilkin contends she produced evidence of pretext by showing that Poudrier deviated from her practice of counseling employees regarding medication documentation issues before terminating their employment when she failed to do so with Wilkin. Wilkin, however, testified at her deposition that she remembered that in November 2017, Poudrier discussed with her the issue of Wilkin's improper documentation of Narcan that had triggered Poudrier's investigation into Wilkin's medication documentation issues. Wilkin testified as follows:

"Q. Did Ms. Poudrier counsel you regarding the documentation that it doesn't support the criteria for Narcan?

"A. She told me that, yes, somebody had—somebody had contacted her, I believe, regarding the documentation regarding the reason for the Narcan. And at that point, you know, I told her I probably should have gone through my student's notes more thoroughly.

"Q. So there was an issue with documentation?

"A. There might have been. I don't know. I don't remember at this time."

As Wilkin's testimony directly undercuts her argument that she was never counseled about medication documentation problems before she was discharged, we do not consider that argument further.

Fourth, Wilkin contends evidence of her January 5, 2018 telephone conversation with Poudrier showed the Hospital's discriminatory intent against her. In her declaration, Wilkin stated that on December 24, 2017, she called in sick because she had a flu bug; she did not use FMLA time. She stated that on January 5, 2018, Poudrier called her and told her that her employment was being terminated because she designated that absence as FMLA leave time, but she did not have any FMLA leave hours left.

21

Wilkin stated she told Poudrier that she had called in sick and did not use FMLA time to account for her absence on December 24.

Wilkin argues in her opening brief "[t]he implausible nature of [the Hospital's] reliance on Wilkin's supposed (but nonexistent) 'attendance issues' in terminating her employment is further revealed by [the Hospital]'s abrupt change in its reason for firing Plaintiff while that termination was occurring. The evidence shows that even the offense for which Wilkin was initially told she was being terminated (i.e., using FMLA hours when she had none left) did not actually occur—and Poudrier—upon learning this inconvenient fact while in the process of firing Wilkin—promptly switched tracks a week later and told Plaintiff that the real reason for her termination was supposed deficiencies in her 'controlled substances' documentation." (Italics and underlining omitted.)

We accept Wilkin's account of the January 5, 2018 conversation with Poudrier as true for purposes of our review. That account, however, does not reflect anything other than Poudrier's mistaken belief that Wilkin's December 24 absence was unexcused. Wilkin's attendance violations and medication documentation issues were already well-investigated by the time of that conversation. The record does not support the inference that the Hospital "promptly switched tracks" as to the reasons for discharging Wilkin by the time of the employment termination meeting set for January 8.

Finally, to the extent Wilkin suggests that an inference of the Hospital's discriminatory intent against Wilkin is supported simply because of the fact Wilkin had previously taken intermittent FMLA leave is without merit.[6] As pointed out by the trial court, Wilkin must produce some evidence showing the Hospital's reasons for

_____

[6] At the hearing on the motion, the trial court asked, "Where is the discrimination?" Wilkin's counsel responded: "Because when she kept taking leave and they were tired of her taking leave. And Ms. Poudrier sends an e-mail when Ms. Wilkin is out on leave saying, 'We need to form a plan.'" As discussed *ante*, given its context, this e-mail does not show discriminatory animus or pretext.

terminating her employment were fabricated or pretextual. Wilkin cites no evidence that links any of her attendance violations, which include missed punches and the failure to report to work on time, to any disability or protected leave. She does not cite evidence linking the investigation into her undisputed problems with medication handling and documentation to any disability or protected leave.

In sum, accepting Wilkin's evidence, there is no disputed issue of material fact. The trial court properly granted summary judgment in favor of the Hospital.

## III.

### THE RETALIATION CLAIMS

In the second cause of action, Wilkin alleged retaliation in violation of FEHA, section 12940, subdivision (h). To establish a prima facie case of retaliation under FEHA, a plaintiff must show "(1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)

In the ninth cause of action, Wilkin alleged retaliation for using accrued sick leave in violation of Labor Code sections 233 and 234[7] and the Healthy Workplaces, Healthy Family Act of 2014 (Lab. Code, § 245 et seq.). Labor Code section 246.5, subdivision (c)(1) provides in part: "An employer shall not deny an employee the right to use accrued sick days, discharge, threaten to discharge, demote, suspend, or in any manner discriminate against an employee for using accrued sick days."

---

[7] Labor Code section 233 provides in relevant part: "An employer shall not deny an employee the right to use sick leave or discharge, threaten to discharge, demote, suspend, or in any manner discriminate against an employee for using, or attempting to exercise the right to use, sick leave to attend to an illness." Labor Code section 234 provides in relevant part: "An employer absence control policy that counts sick leave taken pursuant to Section 233 as an absence that may lead to or result in discipline, discharge, demotion, or suspension is a per se violation of Section 233."

In summary judgment proceedings, a FEHA retaliation claim is treated the same as a FEHA discrimination claim: Where """"the employer presents admissible evidence either that one or more of [the employee's] prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory [or nonretaliatory] factors, the employer will be entitled to summary judgment unless the [employee] produces admissible evidence which raises a triable issue of fact material to the [employer's] showing."""" (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 344, italics omitted.)

The trial court granted summary judgment as to both the FEHA retaliation claim and the Labor Code sick leave retaliation claim on the same grounds it granted summary judgment as to the disability discrimination claim—Wilkin failed to show the Hospital's decision to discipline and terminate her employment was the result of retaliation, and failed to show the Hospital's legitimate, non-retaliatory reasons for her discharge were used as a pretext.

Accepting Wilkin's evidence, there is no disputed issue of material fact. Summary judgment as to the retaliation claims was therefore properly granted.

## IV.

### CLAIMS FOR UNLAWFUL DENIAL OF REASONABLE ACCOMMODATION FOR DISABILITY AND FOR FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS

FEHA imposes on the employer the obligation to make reasonable accommodations: "It is an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California: [¶] . . . [¶] (m)(1) For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." (§ 12940, subd. (m)(1).)

24

FEHA also makes it unlawful for an employer "to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." (§ 12940, subd. (n).) Section 12940, subdivision (n) imposes separate duties on the employer to engage in the "interactive process" and to make "reasonable accommodations."

In her fourth cause of action, Wilkin claimed the Hospital unlawfully denied her a reasonable accommodation for her disability when she requested a medical leave of absence on January 4, 2018. Wilkin stated in her declaration filed in opposition to the motion for summary judgment: "On January 4, 2018, the day before Diana Poudrier called me to schedule the January 8, 2018, termination meeting, I repeatedly attempted to file a request for a personal leave of absence." At her deposition, Wilkin had explained that she had had a medical procedure performed on December 27 and had not been feeling well and that on January 1 she "'called in FMLA'" but could not get a hold of anyone regarding medical leave because it was a holiday. On January 3, she called in and spoke with the night shift charge nurse and told her she was going to go out on medical leave and that she would call Clement the following day. Wilkin testified that she tried to get a hold of Clement and others on January 4 but could only leave word that she needed to speak with someone.

Wilkin's fifth cause of action for failure to engage in the interactive process is based on the allegations the Hospital failed to engage in a timely, good faith, interactive process with Wilkin to determine an effective accommodation after she requested a medical leave of absence in early January 2018. The trial court granted summary judgment as to the fourth and fifth causes of action on the ground Wilkin had already engaged in the misconduct that formed the basis of her legitimate,

25

non-discriminatory, and non-retaliatory discharge before she requested a reasonable accommodation on January 4, 2018.

The accommodation Wilkin proposed in January 2018, that she be placed on a medical leave of absence instead of being discharged for violation of the Hospital's policies, does not qualify as a reasonable accommodation under California law.  (See *Alamillo v. BNSF Ry. Co.* (9th Cir. 2017) 869 F.3d 916, 922; EEOC, Enforcement Guidance:  Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (EEOC ADA Enforcement Guidance), available at 2002 WL 31994335, at *25 ["Since reasonable accommodation is always prospective, an employer is not required to excuse past misconduct even if it is the result of the individual's disability"].)  Here there is no evidence the misconduct upon which Wilkin's employment termination was based was in any way connected to any disability.  Wilkin's reasonable accommodation claim is therefore meritless.

Wilkin's interactive process claim fails for similar reasons.  Wilkin contends the Hospital failed to engage in the interactive process after her documentation issues and attendance violations had already occurred.  No reasonable accommodation could have cured those violations at that point.  Consequently, no reasonable jury could have found in Wilkin's favor on the interactive process claim.

**V.**

**CLAIM FOR FAILURE TO MAINTAIN AN ENVIRONMENT FREE FROM DISCRIMINATION**

In the third cause of action, Wilkin alleged the Hospital failed to provide an environment free from discrimination in violation of FEHA.  An employer cannot be liable for failure to prevent discrimination, however, if there is no actionable discrimination in the first place.  (See *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289 ["Employers should not be held liable to employees for failure to take necessary steps to prevent such conduct, except where the actions took place and were not prevented"]; *Dickson v. Burke Williams, Inc.* (2015) 234 Cal.App.4th 1307,

26

1315.)  Because we affirm summary judgment on all of Wilkin's FEHA causes of action, we also affirm summary judgment on the failure to provide an environment free from discrimination cause of action.

## VI.

### CFRA AND FMLA CLAIMS

Wilkin's sixth cause of action for violation of CFRA and/or FMLA and seventh cause of action for retaliation in violation of CFRA were solely based on the Hospital's decision to terminate her employment in January 2018 instead of granting her a further medical leave of absence that she requested earlier that month.  The trial court granted summary judgment as to those claims on the ground Wilkin failed to proffer evidence creating a triable issue of fact as to whether the Hospital's decision to discipline and terminate her employment was the result of discrimination or retaliation or whether the Hospital's legitimate, non-discriminatory and non-retaliatory reasons for her discharge were used as a pretext.

Wilkin does not dispute that the Hospital's failure to grant her request for leave occurred *after* her medication documentation issues were discovered, her attendance violations had already occurred, and the decision to terminate her employment had been made.  No reasonable jury could find in Wilkin's favor on her violation of CFRA and FMLA claims.  Summary judgment was properly granted as to those claims.

## VII.

### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

In the eighth cause of action, Wilkin alleged the Hospital terminated her employment in violation of public policy.  "Apart from the terms of an express or implied employment contract, an employer has no right to terminate employment for a reason that contravenes fundamental public policy as expressed in a constitutional or statutory provision."  (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252.)

27

Wilkin's wrongful termination in violation of public policy claim was based on her claim the Hospital violated FEHA, CFRA, FMLA and/or the California Constitution, by terminating Wilkin's employment because of her request for family leave under FMLA and/or retaliation for and/or in response to her requests for accommodation under FMLA.

For the reasons discussed *ante*, there are no triable issues of material fact as to Wilkin's FEHA, CFRA, or FMLA claims. Consequently, her claim for wrongful termination in violation of public policy fails as a matter of law. (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 229 [because the plaintiff's FEHA claim failed, his wrongful termination claim also failed].)

## DISPOSITION

The judgment is affirmed. Respondents shall recover costs on appeal.


FYBEL, J.

WE CONCUR:


MOORE, ACTING P. J.


ZELON, J.*

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28

Filed 11/18/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KIMBERLY WILKIN,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>COMMUNITY HOSPITAL OF THE<br>MONTEREY PENINSULA et al.,<br><br>    Defendants and Respondents. | G060420<br><br>(Super. Ct. No. 18CV001139)<br><br>ORDER GRANTING REQUEST<br>FOR PUBLICATION |

       Respondent Community Hospital of the Monterey Peninsula has requested that our opinion, filed October 26, 2021, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c)(1), (2), and (6). The request is GRANTED. The opinion is ordered published in the Official Reports.

                          FYBEL, J.

WE CONCUR:

MOORE, ACTING P. J.

ZELON, J.*

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.